# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JUDICIAL WATCH, INC., | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-00785-JEB |
| REX W. TILLERSON, in his official capacity as SECRETARY OF STATE OF THE UNITED STATES, | |
| Defendant. | |
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-01068-JEB |
| REX W. TILLERSON, in his official capacity as SECRETARY OF STATE OF THE UNITED STATES, and DAVID S. FERRIERO, in his official capacity as ARCHIVIST OF THE UNITED STATES, | |
| Defendants. | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

## INTRODUCTION

In these consolidated cases brought under the Federal Records Act ("FRA"), plaintiffs ask

the Court to order the Department of State ("State") and the National Records and Archives

Administration ("NARA") to initiate legal action through the Attorney General to recover email records sent to or from former Secretary of State Hillary Clinton during her tenure.  Plaintiffs' claims must be dismissed a second time for mootness, as the actions taken by the government before and since this Court's last dismissal remove any doubt that plaintiffs' claims are moot.

The cases are moot, and plaintiffs accordingly lack standing, because the government has established that plaintiffs' requested relief will not do anything further at this point to redress their claimed injury, that is, that the requested relief will not result in the recovery of additional federal email records sent to or from former Secretary Clinton.  With the assistance of Secretary Clinton herself, defendants have engaged in comprehensive remedial measures to recover any such records that might still exist, consistent with the administrative scheme of the FRA.  Even before plaintiffs filed their Complaints, State had obtained from former Secretary Clinton approximately 55,000 pages[1] of emails from her non-governmental account that are federal records.  After the Complaints were filed, this effort was aided, incidentally, by actions taken by the Federal Bureau of Investigation ("FBI") during its investigation of the potential unauthorized transmission and storage of classified information on former Secretary Clinton's personal email server.  Pursuant to this independent investigation, the FBI effectively obtained access to all meaningful nongovernmental repositories (actual or suspected) of former Secretary Clinton's

---

[1]  The number of pages provided by former Secretary Clinton was originally estimated as "approximately 55,000" pages.  *See* Decl. of John F. Hackett ¶ 10, *Leopold v. U.S. Dep't of State*, No. 15-123 (RC) (D.D.C. May 18, 2015) (ECF No. 12-1).  However, once the digitizing process was complete, State was able to provide a more precise count.  *See* Def.'s Status Report at 1, *id.* (Jul. 7, 2015) (ECF No. 20) (reporting that former Secretary Clinton provided 53,988 pages, approximately 1,533 pages of which were identified, in consultation with NARA, as "entirely personal correspondence, that is, documents that are not federal records," leaving approximately 52,455 pages).  This brief will continue to use the "approximately 55,000" number to refer to the size of this production.

email records; those repositories have been searched, and any recoverable emails have been retrieved.  Those emails and other documents have now been turned over to the State Department (except for a small subset identified in a separate investigation that will be turned over in the future[2]).  Defendants have no reason to believe that any additional recoverable federal email records still exist, and the FBI affirms that there are no further investigative actions to be undertaken.  Therefore, a request to the Attorney General pursuant to the FRA to initiate action to recover records would not result in the recovery of additional records.

In short, plaintiffs can receive no further effective redress from this Court under the FRA, and thus they no longer have standing.  In other words, their claims are now definitively established to be moot.  The consolidated cases should therefore be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject-matter jurisdiction.  In the alternative, defendants should be granted summary judgment under Federal Rule of Civil Procedure 56 for the same reasons.  There are no material facts in dispute and the record demonstrates that defendants are entitled to judgment as a matter of law because there are no reasonably recoverable federal records "removed" from the agency that would trigger a duty to refer the matter to the Attorney General.

## BACKGROUND

## I.   STATUTORY AND REGULATORY FRAMEWORK

The FRA is "a collection of statutes governing the creation, management, and disposal of records by federal agencies."  *Pub. Citizen v. Carlin*, 184 F.3d 900, 902 (D.C. Cir. 1999); *see* 44 U.S.C. §§ 2101-20, 2901-11, 3101-07, 3301-14.  These statutory provisions "establish a unified

---

[2]   *See* Declaration of E.W. Priestap, Assistant Director, Counterintelligence Division, Federal Bureau of Investigation ¶ 14 (submitted herewith as Exhibit 1) ("Priestap Decl.").

system for handling the 'life cycle' of federal records – covering their creation, maintenance and use, and eventually their disposal by either destruction or deposit for preservation." *Am. Friends Serv. Comm. v. Webster*, 720 F.2d 29, 36 (D.C. Cir. 1983).

Under the FRA, each agency head is required to "establish and maintain an active, continuing program for the economical and efficient management of the records of the agency," 44 U.S.C. § 3102, and to "establish safeguards against the removal or loss of records the head of such agency determines to be necessary and required by regulations of the Archivist" of the United States. *Id.* § 3105. The FRA defines a "record" as "recorded information, regardless of physical form or characteristics, made or received by a Federal agency . . . and preserved or appropriate for preservation . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." *Id.* § 3301(a)(1)(A).

The Archivist acts in concert with all federal agencies and agency heads in implementing the FRA. The FRA mandates that the Archivist must "provide guidance and assistance to Federal agencies with respect to . . . ensuring proper records disposition," 44 U.S.C. § 2904(a), "promulgate standards, procedures, and guidelines with respect to records management," *id.* § 2904(c)(1), and "conduct inspections or surveys of the records and the records management programs and practices within and between Federal agencies," *id.* § 2904(c)(7).

The FRA further sets forth the exclusive means for records disposal. *See* 44 U.S.C. § 3314; *Citizens for Responsibility & Ethics in Wash. v. Executive Office of the President*, 587 F. Supp. 2d 48, 53 (D.D.C. 2008). In general, agencies may only dispose of records as approved by the Archivist. 44 U.S.C. § 3303; 36 C.F.R. § 1226.10. In order to manage the disposition process efficiently, agencies create records schedules – negotiated with and approved by NARA

4

– to govern the disposition of recurring types of records.  44 U.S.C. § 3303(3); 36 C.F.R.

§§ 1225.10-1225.26.  Records may be deemed temporary or permanent, the former designation

leading to destruction after a set period, and the latter to preservation and eventually transfer to

the National Archives of the United States.  36 C.F.R. §§ 1225.14, 1225.16.

The FRA also includes statutory provisions addressing records that have been unlawfully

removed or destroyed.  44 U.S.C. §§ 2905(a), 3106(a) & (b); *see Armstrong v. Bush*, 924 F.2d

282, 294 (D.C. Cir. 1991).  The primary responsibility for recovering such records rests with the

agency whose records are at issue.  Each agency head is first required to "notify the Archivist of

any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion,

erasure, or other destruction of records in the custody of the agency."[3]  44 U.S.C. § 3106(a); *see

also* 36 C.F.R. pt. 1230 (NARA's regulations addressing the removal, alienation, or destruction

of records).  For "records the head of the Federal agency knows or has reason to believe have

been unlawfully removed from that agency[,]" the agency head "with the assistance of the

Archivist shall initiate action through the Attorney General for the recovery of records[.]"  44

U.S.C. § 3106(a).  If, on the other hand, the Archivist learns of the "actual, impending, or

threatened unlawful removal, defacing, alteration, or destruction of records in the custody of the

agency," then he or she "shall notify" the relevant agency head.  *Id.* § 2905(a).  The Archivist

also is directed to "assist the head of the agency in initiating action through the Attorney General

for the recovery of records unlawfully removed and for other redress provided by law."  *Id.*  If

the agency head "does not initiate an action for such recovery or other redress within a

reasonable period of time after being notified of any such unlawful action," the Archivist is to

---

[3]  Defendants do not concede that the records at issue in this case were unlawfully removed or destroyed, but assume for the purposes of this motion that this statutory regime applies in these circumstances.

"request the Attorney General to initiate such an action, and . . . notify the Congress when such a request has been made." *Id.*; *see also id.* § 3106(b).

As this Circuit has explained in ruling on a prior appeal in the present cases, "nothing in § 3106 prevents the agency from first attempting its own remedial measures (rather than immediately rushing to the Attorney General)" unless and until "those efforts are unsuccessful." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016) (*Judicial Watch II)* (citing *Armstrong)*; *id*. at 956 (recognizing that "sometimes an agency might reasonably attempt to recover its records before running to the Attorney General . . ."). The manner in which the agency carries out its duty to restore its federal records "is left to the agency's discretion" and it "has choices regarding the 'manner of its action.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. S.E.C.,* 916 F. Supp. 2d 141, 149 (D.D.C. 2013) (*CREW v. SEC)* (citing *Norton v. S. Utah Wilderness All.,* 542 U.S. 55, 64 (2004)). Thus, the agency head or the Archivist is not required to initially request the Attorney General to take legal action to recover records. Instead, the FRA contemplates that the agency head and Archivist may proceed first by invoking the agency's "safeguards against the removal or loss of records," 44 U.S.C. § 3105, and by taking a variety of intra-agency corrective actions, as appropriate. *Armstrong*, 924 F.2d at 296 n.12; *see also CREW v. SEC,* 916 F. Supp. 2d at 150 (discussing *Armstrong)*. *Judicial Watch II* did not change this scheme. In discussing *Armstrong* in *dicta*,[4] the court of appeals explained that "[w]hile we recognized that sometimes an agency might reasonably attempt to recover its records before running to the Attorney General, . . . we never implied that where those initial efforts failed to

---

[4] The *Judicial Watch* court only reached the mootness question and did not reach the question of whether the agencies' actions satisfied their duties under the FRA. 844 F.3d at 956.

recover all the missing records (or establish their fatal loss), the agency could simply ignore its referral duty." *Judicial Watch II,* 844 F.3d at 956 (citation omitted).

The FRA does not authorize a private right of action to enforce any of its provisions, *see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 149-50 (1980), and only limited judicial review of compliance with the FRA is available under the Administrative Procedure Act ("APA"). *Armstrong*, 924 F.2d at 291. The D.C. Circuit has held that the FRA precludes APA claims seeking to prevent the destruction or removal of records. *Id.* at 294; *see also* 44 U.S.C. §§ 2101-20, 2901-11, 3101-07, 3301-14. Instead, the APA authorizes a private party to bring suit only (1) to compel notification of NARA or (2) to compel the agency or NARA to request the Attorney General to initiate action to recover removed records. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 101, 111 (D.D.C. 2007) (*CREW v. DHS*); *CREW v. SEC*, 916 F. Supp. 2d at 146.

## II.    FACTUAL BACKGROUND

Hillary Rodham Clinton served as Secretary of State from January 21, 2009, until February 1, 2013. As alleged in the Complaints, while heading the State Department, Secretary Clinton sent and received emails pertaining to government business from her personal email accounts.[5] *See* Compl., *Judicial Watch v. Kerry*, No. 1:15-cv-00785-JEB (ECF No. 1) ("JW Compl."), ¶ 5. These emails were maintained on a variety of personal – not government – servers and devices. *Id.*; *see also* Priestap Decl. ¶¶ 4-14 & Exh. A thereto.

---

[5]   The FRA now prohibits "[a]n officer or employee of an executive agency" from "creat[ing] or send[ing] a record using a non-official electronic messaging account," unless such officer or employee copies his or her government email account or forwards a complete copy of the email to his or her government email account within 20 days. 44 U.S.C. § 2911(a) (added 2014).

Since learning of Secretary Clinton's use of personal email accounts for government business, State, NARA, and the FBI have undertaken the following actions to preserve and retrieve all recoverable federal email records sent or received by Secretary Clinton:

**A.    Events Before the Complaints Were Filed**

1.    In October and November 2014, the Under Secretary of State for Management, Patrick F. Kennedy, sent letters to representatives of Secretary Clinton and three other former Secretaries of State requesting that copies of any emails from their personal email accounts that constituted federal records be provided to the State Department, if there was reason to believe those records may not otherwise be preserved in the Department's recordkeeping system.[6] *See* Exh. 4 to Compl., *Cause of Action Institute v. Kerry*, No. 1:15-cv-01068-JEB (ECF No. 1) ("COAI Compl."). In response, on December 5, 2014, Secretary Clinton, through her representative, provided to State approximately 55,000 pages of documents that she believed were responsive to that request. *Id.*; JW Compl. ¶ 6.

2.    On March 3, 2015, Paul Wester, Chief Records Officer for the U.S. Government at NARA, wrote to State pursuant to NARA's authority under 44 U.S.C. chapter 29 and its implementing regulations, 36 C.F.R. pt. 1230, requesting that State explore the matter of the email records of the former secretaries of state, including Secretary Clinton, and provide NARA with a report. COAI Compl., Exh. 2. State responded on April 2, 2015, explaining the efforts it had made to recover records and that it had received approximately 55,000 pages of emails from

---

[6] Because of an error, the letters to the representatives for Secretaries Clinton, Powell, and Albright had to be re-sent in November since the original letters to those representatives referenced Secretary Rice instead of their corresponding former Secretary. *See* Exh. 4 to COAI Compl.

former Secretary Clinton.  *Id.,* Exh. 4.  Since then, NARA and State have continued to engage in

dialogue regarding issues raised by Secretary Clinton's use of email.[7]

3. On March 11, 2015, the State Department requested that the former aides to

former Secretary Clinton, including Cheryl Mills, Huma Abedin, Jacob Sullivan and Philippe

Reins, make any records in their possession available to the Department.  *See* Letter from Patrick

Kennedy, State, to Laurence Brewer, NARA (Nov. 6, 2015), at 4, https://www.archives.gov/files/

foia/11-6-15%20letter.pdf ("Nov. 6 Letter").

4. On May 22, 2015, State requested that former Secretary Clinton provide an

electronic copy of the approximately 55,000 pages of emails produced to State.  *See* ECF No. 9-2

(in Case No. 15-785), at 3.  Secretary Clinton's attorney initially responded that he would do so,

*see id.* at 5, but later advised that the email server that was used to store Secretary Clinton's

emails while she was Secretary of State and multiple thumb drives that he indicated included

electronic copies of the documents she had provided to State, had been turned over to the FBI for

its investigation (*see* subsection C *infra*).  *See* Nov. 6 Letter, at 3.

**B.** **Events After the Complaints Were Filed But Previously Before This Court**

1. On July 2, 2015 (after the *Judicial Watch* Complaint was filed), NARA repeated

its request that the State Department secure electronic copies of the 55,000 pages of email

Secretary Clinton had provided the Department.  *See* Letter from Paul M. Wester, NARA, to

Margaret P. Grafeld, State (July 2, 2015), https://www.archives.gov/files/press/press-

releases/2016/pdf/wester-to-dept-of-state_response-to-april-letter_2015-7-2.pdf.

---

[7] *See generally* correspondence located at https://www.archives.gov/foia/state-formal-
correspondence.

2.      Both the State Department and the FBI requested that custodians for potential repositories of Secretary Clinton's emails preserve all possible Clinton records, electronic or otherwise, in their possession or control.  *See* Def.'s Objections to Pl.'s Proposed Preservation Order, at 7-8, *Judicial Watch v. U.S. Dep't of State*, No. 12-2034 (D.D.C. Sept. 9, 2015) (ECF No. 28); *see also* https://vault.fbi.gov/hillary-r.-clinton (complete memorandum of FBI investigation with attachments).

3.      On September 14, 2015, the State Department requested that the FBI provide "an electronic copy of the approximately 55,000 pages identified as potential federal records and produced on behalf of former Secretary Clinton to the Department of State on December 5, 2014."  *See* Letter from Patrick F. Kennedy, State, to James B. Comey, FBI (Sept. 14, 2015), ECF No. 9-2 (in No. 15-785), at 1-2.  State also asked that, "to the extent the FBI recovers any potential federal records that may have existed on the server at various points in time in the past, [the FBI] apprise the [State] Department insofar as such records correspond with Secretary Clinton's tenure at the Department of State."  *Id.*  Third, State requested that, "[b]ecause of the Department's commitment to preserving its federal records, . . . any recoverable media and content be preserved by the FBI so that we can determine how best to proceed."  *Id.*

**C.      Events After this Court's January 11, 2016, Decision**

1.      The FBI issued a memorandum on its investigation in July, 2016.  *See* Exh. A to Priestap Decl.  As explained in that memorandum and in Assistant Director Priestap's Declaration (Exhibit 1 hereto), the FBI obtained the following repositories or potential repositories of Clinton email records and searched for and retrieved any potential emails from those repositories (*see generally* Priestap Decl. ¶ 3) –

a.  A private server (the "Pagliano Server") installed at Clinton's Chappaqua, New York, residence in or around March 2009, and used from then until approximately December 2013, *see* Priestap Decl. ¶¶ 6, 8; Exh. A, at 3-5;

b.  A Seagate external hard drive used to store backups of the Pagliano Server from March 2009 until June 2011, *see* Priestap Decl. ¶ 8; Exh. A, at 5;

c.  A Cisco Network Attached Storage device used to store backups of the Pagliano Server; from June 2011 forward, *see* Priestap Decl. ¶ 8; Exh. A, at 5;

d.  A Platte River Networks ("PRN") server, resident at a datacenter in Secaucus, New Jersey, run by Equinix Inc., used from June 2013 until obtained by the FBI in October 2015, *see* Priestap Decl. ¶¶ 9-10; Exh. A, at 5-7;

e.  A known commercial email account used in migrating data from the Pagliano Server to the PRN Server, *see* Priestap Decl. ¶ 9; Exh. A, at 17;

f.  A Datto SIRIS 2000 device used to store backups of the PRN Server, *see* Priestap Decl. ¶ 10; Exh. A, at 7;

g.  The cloud backup of the Datto device, *see* Priestap Decl. ¶ 10; Exh. A, at 7;

h.  Copies of backups of BlackBerry devices utilized by Secretary Clinton, *see* Priestap Decl. ¶ 11;

i.  Two BlackBerry devices associated with Secretary Clinton, *see* Priestap Decl. ¶ 12; Exh. A, at 8-9; and

j.  Three iPads associated with Secretary Clinton, *see* Priestap Decl. ¶ 13; Exh. A, at 9.

In addition, the FBI reported the following:

k.  Prior to January 21, 2009, when Clinton was confirmed as Secretary of State, and for a couple of months thereafter, Clinton used a personally-acquired BlackBerry device with service initially from Cingular Wireless and later AT&T Wireless, to access her email accounts, with the email addresses hr15@mycingular.blackberry.net and then changed to hr15@att.blackberry.net.  The FBI sought to obtain emails from these accounts for the period of the former Secretary's tenure at State.  The FBI obtained grand jury subpoenas related to the accounts, which produced no responsive materials, as the requested data were outside the retention time utilized by those providers.  The FBI did not recover any information indicating that Secretary Clinton sent an email from her hr15@mycingular.blackberry.net or hr15@att.blackberry.net emails after March 18, 2009.  *See* Priestap Decl. ¶ 4; Exh. A, at 3, 20; and

1. The original private server located at Secretary Clinton's Chappaqua residence (the "Apple Server") was replaced by the Pagliano Server in March 2009.  During the installation of the Pagliano Server, Clinton's former staff believe all email from the Apple Server was migrated, and therefore no email content should have remained on the Apple Server.  Sometime in 2014, some data from the Apple Server was transferred to a new Apple iMac computer, and the hard drive of the old Apple Server was subsequently destroyed.  The FBI was therefore unable to obtain the original Apple Server for a forensic review.  The FBI did not seek to obtain the iMac computer for forensic review because the device did not facilitate Secretary Clinton's use of email during her tenure.  However, at the request of the FBI, the Department of Justice requested that Williams & Connolly LLP, Clinton's private counsel, coordinate a review of all data on the iMac through a keyword search consisting of terms identified by the FBI.  On October 14, 2015, Williams & Connolly confirmed to the Department of Justice that a review of the iMac was conducted pursuant to this request, and no emails were found belonging to Clinton from the period of her tenure as Secretary of State.  *See* Priestap Decl. ¶¶ 5-7; Exh. A, at 4-5.

2.      As a result of its investigation, the FBI recovered additional work-related and personal emails and documents from Clinton's tenure that were not provided as part of Clinton's earlier production consisting of approximately 55,000 pages.  Priestap Decl. ¶ 14.  Pursuant to State's request, the FBI has since turned over all of these emails and documents to State for it to conduct a records assessment, *i.e.*, to determine which materials are personal versus work-related.  *Id.*; *see* Letter from Patrick Kennedy, State, to James B. Comey, FBI  (July 8, 2016), *Judicial Watch, Inc. v. U.S. Dep't of State*, No. 13-1363-EGS (D.D.C. July 12, 2016) (ECF No. 103-1).  In addition, further investigative activities undertaken in October 2016 resulted in additional emails being discovered that may be potentially work related.  Priestap Decl. ¶ 14. The FBI will provide these emails to State for it to conduct a records assessment in the future. *Id.*

## III.   THE LAWSUITS AND PRIOR DECISIONS

Plaintiff Judicial Watch states that it is a non-profit, educational organization dedicated to promoting "transparency, accountability, and integrity in government" and that it has many

outstanding FOIA requests pending with State that potentially encompass Secretary Clinton's emails. JW Compl. ¶ 3. The gravamen of Judicial Watch's Complaint is that "the State Department's failure to retain, manage, and search" Secretary Clinton's email records violates the FRA, which violation cannot be remedied "unless and until [State] . . . initiates action through the attorney general to recover the Clinton emails." *Id.* ¶¶ 7, 29. Judicial Watch seeks declaratory and injunctive relief under the Administrative Procedure Act to require such action. *See id.* ¶¶ 20-29.

Plaintiff Cause of Action Institute ("COAI") states that it is a non-profit "strategic oversight group committed to ensuring that the regulatory process is transparent, fair, and accountable" and that it "has a pending Freedom of Information Act request before the State Department for records that likely include emails to and from former Secretary Clinton." COAI Compl. ¶ 21. COAI's Complaint contends that the defendants have violated their duties under the FRA "by failing to initiate action through the Attorney General to recover the unlawfully removed records" and, in defendant Ferriero's case, by failing to notify Congress of such action. *Id.* ¶¶ 61-62. In addition to mirroring Judicial Watch's request for injunctive and declaratory relief, COAI also asks the Court to issue a writ of mandamus ordering defendants to comply with the FRA "by initiating legal action against Clinton through the Attorney General." *Id.* ¶ 68. Both plaintiffs invoke the APA provision permitting courts to "compel agency action unlawfully withheld or unreasonably delayed" as the basis for the relief they seek. *See* 5 U.S.C. § 706(1). The Court consolidated the two cases. *See* Minute Order of August 4, 2015.

Defendants moved to dismiss on several grounds, and the district court granted the motion, dismissing the suits as moot. *Judicial Watch, Inc. v. Kerry*, 156 F. Supp. 3d 69 (D.D.C. 2016) (*Judicial Watch I*). The Court found that "the FRA does not require the Attorney

General's involvement if agencies are willing and able to recover unlawfully removed documents on their own." *Id.* at 76. The Court therefore reasoned that a plaintiff's ability to "compel a referral to the Attorney General . . . is limited to those circumstances in which an agency head and Archivist have taken minimal or no action to remedy the removal or destruction of federal records." *Id.* (discussing, *inter alia*, *Armstrong*, 924 F.2d at 296 (providing that "private litigants may bring suit to require the agency head and Archivist to fulfill their statutory duty to notify Congress and ask the Attorney General to initiate legal action," "if the agency head or Archivist *does nothing* while an agency official destroys or removes records in contravention of agency guidelines and directives") (emphasis added)). The Court then found, based on the record then before it, that the State Department and the Archivist had "taken a number of significant corrective steps" to recover the missing emails, representing a "sustained effort." *Judicial Watch I,* at 76, 77. The Court concluded that there accordingly was no "dereliction of duty" on defendants' part, and that plaintiffs' claims were moot. *Id.* at 77. As the Court stated, plaintiffs "cannot sue to force the recovery of records that they hope or imagine might exist." *Id.*

The Court of Appeals reversed. *Judicial Watch II*, 844 F.3d 952. The Court of Appeals observed that plaintiffs had not been given "what they wanted" – an enforcement action through the Attorney General – and that defendants had "not explained why shaking the tree harder – *e.g.,* by following the statutory mandate to seek action by the Attorney General – might not bear more" fruit in the form of additional emails. *Id.* at 955. Accordingly, the Court of Appeals concluded that "[a]bsent a showing that the requested enforcement action could not shake loose a few more emails, the case is not moot." *Id.* However, the Court of Appeals observed that "the case might well . . . be moot if a referral were pointless (*e.g.,* because no imaginable enforcement action by the Attorney General could lead to recovery of the missing emails)," although noting

that the record as it then existed on appeal "provides no factual support for finding mootness on that basis." *Id.* at 956.

## STANDARD OF REVIEW

Defendants seek dismissal of these two consolidated cases under Federal Rule of Civil Procedure 12(b)(1), on the ground that the Court lacks subject-matter jurisdiction because the cases are now definitively moot in light of the events that have occurred since this Court's previous ruling.  The burden of establishing mootness rests with the party seeking dismissal under Rule 12(b)(1).  *Honeywell Int'l, Inc. v. Nuclear Regulatory Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010).  However, "[a]lthough a court must accept as true all factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1)," the factual allegations in the complaint "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (citations omitted), *aff'd*, 2008 WL 4068606 (D.C. Cir. Mar. 17, 2008).  The Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

In the alternative, defendants seek summary judgment under Federal Rule of Civil Procedure 56 on the ground that there are no material facts in dispute and they are entitled to judgment as a matter of law.  On summary judgment, "[t]he task of the court is to review the factual material the parties present in support of and opposition to the motion, in light of the parties' legal claims and defenses, and assess whether the record contains disputes calling for resolution by a factfinder."  *Johnson v. Perez*, 823 F.3d 701, 705 (D.C. Cir. 2016).  In performing this assessment, "the court views the evidence in the light most favorable to the

nonmoving party . . . and draws all reasonable inferences in his favor. . . .  But if one party

presents relevant evidence that another party does not call into question factually, the court must

accept the uncontroverted fact."  *Id.*

## ARGUMENT

### I. THE CASES ARE MOOT BECAUSE THERE IS NO EVIDENCE THAT A REFERRAL TO THE ATTORNEY GENERAL WOULD PROVIDE ANY RELIEF TO PLAINTIFFS IN THE FORM OF ADDITIONAL EMAIL RECORDS

For a federal court to have jurisdiction over an action, a plaintiff must establish that his or

her case meets the case-or-controversy requirement of Article III.  The doctrine of standing is an

essential aspect of this case-or-controversy requirement and demands that a plaintiff have "a

personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-

court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975).  At its "irreducible constitutional

minimum," the standing doctrine requires satisfaction of three elements:  (1) a concrete and

particularized injury-in-fact, either actual or imminent, (2) a causal connection between the

injury and defendants' challenged conduct, and (3) a likelihood, "as opposed to merely

'speculative' [possibility]," that the injury suffered will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Subject-matter jurisdiction is not a static concept to be evaluated once, and thereafter

forgotten.  "To qualify as a case for federal-court adjudication, 'an actual controversy must be

extant at all stages of review, not merely at the time the complaint is filed.'"  *Arizonans for*

*Official English v. Arizona*, 520 U.S 43, 67 (1997).  "A case becomes moot – and therefore no

longer a 'Case' or 'Controversy' for purposes of Article III – 'when the issues presented are no

longer live or the parties lack a legally cognizable interest in the outcome.'"  *Already, LLC v.*

*Nike, Inc.*, 568 U.S. 85, __, 133 S. Ct. 721, 726-27 (2013).

The Court must determine whether it has jurisdiction before addressing the merits of a claim. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95, 104 (1998). In general, the party invoking federal jurisdiction bears the burden of establishing standing. *Defenders of Wildlife*, 504 U.S. at 561. However, the burden of establishing mootness rests with the party seeking dismissal. *Honeywell Int'l, Inc.*, 628 F.3d at 576. Where a plaintiff fails to establish each of the elements of standing, or where defendant has established that the case has become moot, the court must dismiss that claim for lack of subject matter jurisdiction. *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475-76 (1982) ("Those who do not possess Article III standing may not litigate as suitors in the courts of the United States."); *Cierco v. Lew*, 190 F. Supp. 3d 16, 23 (D.D.C. 2016) (where "the case is moot, . . . this Court lacks jurisdiction to entertain the suit"), *appeal filed*, No. 16-5185 (D.C. Cir. June 28, 2016); *George v. Napolitano*, 693 F. Supp. 2d 125, 128-29 (D.D.C. 2010) ("Lack of standing is a defect in subject matter jurisdiction.").

As relevant here, the third prong of the standing inquiry, redressability, requires that a plaintiff allege that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Defenders of Wildlife*, 504 U.S. at 561 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 38, 43 (1976)); *see also Judicial Watch, Inc. v. Nat'l Archives & Records Admin.*, 845 F. Supp. 2d 288, 298-99 (D.D.C. 2012). "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107. And events subsequent to the filing of a complaint can effect redressability, for example, by effectively granting plaintiff the relief sought, thereby mooting out a case. Where, after filing, "appellants have obtained everything that they could recover from this lawsuit, . . . the case is thus moot." *LaRoque v. Holder*, 679 F.3d 905, 909 (D.C. Cir. 2012) (internal quotation

marks and modifications omitted)); *see also Conservation Force, Inc. v. Jewell*, 733 F.3d 1200,

1204 (D.C. Cir. 2013) ("Where the plaintiff has recovered all it has sought, no court action can

provide further relief and the case is moot."); *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir.

2008) ("A case becomes moot when 'intervening events make it impossible to grant the

prevailing party effective relief.'"); *McBryde v. Comm. to Review Circuit Council Conduct &

Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001) ("If events

outrun the controversy such that the court can grant no meaningful relief, the case must be

dismissed as moot.").

Here, defendants have met their burden of establishing that the case is moot because the

relief plaintiffs request – a referral to the Attorney General to initiate legal action to recover

Secretary Clinton's emails – is no longer likely to redress their claimed injury, specifically by

increasing the number of records recovered by the agency.  To recap, since this Court last

considered the case, the FBI completed a comprehensive investigation in which it conducted an

extensive search for, and of, all meaningful actual or suspected nongovernmental repositories of

Secretary Clinton's email records.  *See* Priestap Decl. ¶ 3 ("A primary focus of the FBI's

investigative efforts was the recovery of non-governmental e-mail repositories used by Clinton

during her tenure as Secretary of State."); *id.* ¶ 14 (The FBI's effort "consisted of acquiring all

potentially work-related e-mails within the former Secretary's tenure."); *id.*¶¶ 4-13 (detailing

repositories examined).  As a result of this intensive investigative work, the FBI recovered

thousands of additional emails and other documents, which it has turned over to State or (in the

case of a small subset) will be turning over to State in the future.  *Id.* ¶ 14.  This yield is in

addition to the approximately 55,000 pages of emails already turned over by Secretary Clinton

herself.  The FBI now affirms that, in its belief, there are no investigative actions that can be

undertaken that are reasonably likely to yield any meaningful additional emails or other records. *Id.*; *see also* Declaration of Laurence Brewer, Chief Records Officer for the U.S. Government, NARA, ¶ 4 (Exh. 2 hereto); Declaration of Eric W. Stein, Director of the Office of Information Programs and Services, State, ¶ 3 (Exh. 3 hereto).

In light of these results, and this conclusion, an order from this Court that the defendants refer the case to the Attorney General to initiate action for recovery of records would serve no useful purpose.  There is nothing left that any reasonable efforts would recover and, therefore, nothing left for the Attorney General to do.  In fact, the Attorney General's designee, the FBI, has *already* acted to locate and recover all potentially work-related emails and records that can be located and recovered, and its work has been completed.  Priestap Decl. ¶ 14.  As the Court of Appeals predicted, therefore, "no imaginable enforcement action by the Attorney General could lead to recovery of the missing emails." *Judicial Watch II,* 844 F.3d at 956.  Nor would there be any continuing jurisdiction for plaintiffs to second-guess the actions, or nonactions, of the FBI if a referral were made – their cause of action under the FRA ends with the referral to the Attorney General.

In continuing to argue the necessity for a referral to the Attorney General, plaintiffs have identified two possible gaps in the records recovered.  But further examination does not suggest that anything remains to be done even as to these two subsets, therefore failing to justify any need for referral to the Attorney General for further action.  First, plaintiffs believe that additional efforts could be exerted to recover emails sent or received from Secretary Clinton's BlackBerry email account in the first couple of months of her tenure, before she transitioned to her email account on the clintonemail.com domain.  *See Judicial Watch II*, 844 F.3d at 955.  But the recovery of these emails was in fact a priority for the FBI's investigation, and it exerted

considerable effort to try to retrieve them.  Priestap Decl. ¶ 4 ("an investigative emphasis was

placed on obtaining early tenure e-mails in order to understand the circumstances for deciding to

use the private e-mail server").  The FBI obtained subpoenas for information and/or records

relating to Clinton's BlackBerry email accounts and was advised that there were no responsive

records as the requested data was outside the retention time utilized by those providers.  *Id.*

Accordingly, the FBI undertook comprehensive efforts to recover these emails, and there is

nothing more that the FBI would do to recover them in the event of a referral to the Attorney

General.  *Id.* ¶ 14.

Second, plaintiffs have questioned whether the "Apple Server" was adequately searched.

In its report, the FBI explained that it believed it was unlikely that the Apple Server contained

any emails after the data on it was migrated to the Pagliano Server in 2009.  *See* Priestap Decl.

¶ 6; *id.,* Exh. A at 4 (although there is some confusion among the witnesses, Pagliano testified

that "no e-mail content should have remained on the Apple Server").  The FBI further explained

that, in 2014, some data on the Apple Server was transferred to an Apple iMac before the Apple

Server was destroyed.  *Id.*  As the Apple Server was then discarded, the FBI could not obtain it

for forensic review.  *Id.* ¶ 6.  The FBI further explained that it did not seek to obtain the iMac

computer for forensic review because the device did not facilitate Secretary Clinton's use of

email during her tenure.  *Id.* ¶ 7.  Nevertheless, the FBI requested (through the Department of

Justice) that Clinton's attorneys at Williams & Connolly LLP ensure that the iMac was reviewed

for emails, using keywords suggested by the FBI.  Priestap Decl. ¶ 7.  In October 14, 2015,

Williams & Connolly confirmed that a review of the iMac was conducted pursuant to this

request, and no emails were found belonging to Clinton from the period of her tenure as

Secretary of State.  *Id.*  The FBI has found no information that this review was not

comprehensive and accurate.  *Id.*

In sum, the FBI's investigation leaves no room to believe that any further meaningful

avenues exist that would actually yield more email records.  Priestap Decl. ¶ 14.  To be sure, the

government has not granted plaintiffs the precise relief requested – an order directing referral to

the Attorney General.  But a case is moot as long action by the court cannot remedy plaintiffs'

*injury*, even if the precise form of relief they ask for remains unfulfilled.  Here the asserted injury

is the lack of access to federal records because of the agency's failure to recover those records

from Secretary Clinton or other repositories outside the government.  If no recoverable records

exist in those repositories, no relief can redress plaintiffs' injury, because the injury has already

been redressed.  For this reason, the Court of Appeals expressly recognized that, even without a

referral to the Attorney General, these cases would nevertheless be "moot if a referral were

pointless (*e.g.,* because no imaginable enforcement action by the Attorney General could lead to

recovery of the missing emails)."  *Judicial Watch II*, 844 F.3d at 956.  That is the case here.

Accordingly, in light of the actions taken by the defendants and the FBI to recover Secretary

Clinton's emails from every known possible nongovernmental repository, plaintiffs are not

entitled to any further relief under the FRA and their cases are moot.

## II.  IN THE ALTERNATIVE, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE OF ANY EXTANT UNRECOVERED RECORDS THAT WOULD TRIGGER REFERRAL TO THE ATTORNEY GENERAL

In the alternative, defendants are entitled to summary judgment under Federal Rule of

Civil Procedure 56 on the ground that there are no material facts in dispute and they are entitled

to judgment as a matter of law.  Plaintiffs cannot dispute the facts and results of the FBI

investigation as laid out in the FBI's detailed report and further elaborated on in the Priestap

Declaration submitted herewith.  That report details that the FBI is not aware of any unrecovered Clinton email records outside governmental custody that could reasonably be pursued.  *See* Priestap Decl. ¶ 14.  Accordingly, there are no longer any extant unrecovered records outside of government control that would trigger State's and NARA's duties to make a referral to the Attorney General under the FRA.  The FRA directs referral to the Attorney General when "the head of the Federal agency knows or has reason to believe [that records] have been unlawfully removed from that agency."  44 U.S.C. § 3106(a).  As a result of the FBI's report and the information included in Assistant Director Priestap's Declaration, the responsible officials at both State and NARA assert that they do not now knows or have reason to believe that any recoverable Clinton email records remain extant that "have been . . . removed" and are not currently in the possession of State or the FBI.  *See* Brewer Decl. ¶ 4; Stein Decl. ¶ 3.  Accordingly, the statute does not require referral in this circumstance.  In the absence of any evidence of unrecovered "removed records," the referral duty of 44 U.S.C. 3106(a) is not triggered.  Accordingly, defendants are entitled to summary judgment as a matter of law.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss both Complaints for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, should grant summary judgment for defendants under Federal Rule of Civil Procedure 56.

Dated:  April 24, 2017                                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

MARCIA BERMAN
Assistant Director

*/s/ Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendant*