**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JUDICIAL WATCH, INC., | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-00785-JEB |
| REX W. TILLERSON, in his official capacity as SECRETARY OF STATE OF THE UNITED STATES, | |
| Defendant. | |
| CAUSE OF ACTION INSTITUTE, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-01068-JEB |
| REX W. TILLERSON, in his official capacity as SECRETARY OF STATE OF THE UNITED STATES, and DAVID S. FERRIERO, in his official capacity as ARCHIVIST OF THE UNITED STATES, | |
| Defendants. | |

**MEMORANDUM IN OPPOSITION TO PLAINTIFFS' CROSS-MOTIONS FOR
SUMMARY JUDGMENT AND/OR DISCOVERY, AND IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE,
<u>FOR SUMMARY JUDGMENT</u>**

## <u>INTRODUCTION</u>

Plaintiffs seek to discount not only the extensive efforts undertaken by the United States

Department of State ("State") to recover former Secretary of State Hillary Clinton's email

records from her tenure as Secretary of State, but also the results of an exhaustive and comprehensive investigation by the Federal Bureau of Investigation ("FBI"), in the course of which the FBI searched for and retrieved thousands of additional email records.  Instead of being satisfied with these efforts, plaintiffs insist that the Federal Records Act ("FRA") requires further efforts to recover emails.  They assert that, at the very least, they need extensive discovery to flesh out all the details of the FBI's and State's work so that they, or the courts, can second-guess what State and the National Archives and Records Administration ("NARA") have already determined in the first instance – that State and NARA do not know or have reason to believe that additional unrecovered email records exist.

But the record supports the agencies' determinations.  Plaintiffs' assertions that additional emails may be recovered from Secretary Clinton's BlackBerry email providers, from an iMac hard drive, from the accounts of her correspondents, or from missing mobile devices, are pure speculation.  The information gathered by the FBI in the course of its investigation confirms that any further attempt to search for emails, or to conduct discovery into prior searches for emails, would be an expensive and fruitless wild-goose chase well outside the bounds of what is required by the FRA.  Any still unrecovered emails are as "fatally lost" as electronic data can be in a world of finite resources and time.  *See Judicial Watch v. Kerry*, 844 F.3d 952, 955 (D.C. Cir. 2016).

The Court of Appeals has already recognized that this case will be moot on the ground of lack of redressability "if a referral were pointless."  *Judicial Watch*, 844 F.3d at 956.  Moreover, NARA confirms that "the State Department and FBI's efforts to recover the missing Federal records of former Secretary of State Hillary Clinton are consistent with what agencies are required to do when records have been destroyed or alienated" and that "[t]hese efforts meet

NARA's expectations [under the FRA] with regard to the unauthorized destruction or alienation of records."  Second Declaration of Laurence Brewer, Chief Records Officer, NARA ¶¶ 3, 15 ("Second Brewer Decl.") (Exh. 1 hereto).  Accordingly, these cases should be dismissed as moot, or summary judgment should be granted for defendants as they have fully satisfied their obligations under the FRA.

<u>**ARGUMENT**</u>

I.    **THE EFFORTS BY STATE AND THE FBI TO RECOVER FORMER SECRETARY CLINTON'S FEDERAL RECORD EMAILS WERE THOROUGH AND EXHAUSTIVE, AND STATE AND NARA HAVE REASONABLY CONCLUDED THAT THEY DO NOT KNOW OR HAVE REASON TO BELIEVE THAT ADDITIONAL UNRECOVERED EMAIL RECORDS EXIST**

As set forth in defendants' earlier memorandum, State initially recovered a large number of emails from former Secretary Clinton herself pertaining to her tenure as Secretary ("tenure emails"), and, subsequently, the FBI engaged in an exhaustive investigation that recovered additional tenure emails from numerous sources.  Defs.' Mem. in Supp. of Mot. to Dismiss or for Summ. J. 7-12 ("Defs.' Mem.," ECF No. 33-1).  As a result of those efforts, both NARA and State have concluded that they do not "know[]" or have any "reason to believe" that any additional federal records sent to or from former Secretary Clinton's nongovernmental email accounts still exist.  *See* Second Brewer Decl. ¶ 3; Second Declaration of Eric F. Stein, Director, Office of Information Programs and Services, State ¶ 3 ("Second Stein Decl.") (Exh. 2 hereto); *see also* First Brewer Decl. (ECF No. 33-3), ¶ 4; First Stein Decl. (ECF No. 33-4), ¶ 3. Defendants have therefore shown that any action by the Attorney General would not be likely to redress plaintiffs' injury by recovering any additional federal records.  Accordingly, plaintiffs can no longer demonstrate the necessary redressability to establish Article III standing, and the Court should dismiss these cases as moot.  *See Citizens Alert Regarding The Env't v. Leavitt*, 355

3

F. Supp. 2d 366, 369 (D.D.C. 2005) ("Where intervening events preclude the Court from granting plaintiffs any effective relief, even if they were to prevail on their underlying claim, the Court must dismiss a suit as moot for want of subject matter jurisdiction." (citing *Church of Scientology v. United States*, 506 U.S. 9, 11 (1992)). In the alternative, defendants have done all that is required under the FRA and are therefore entitled to summary judgment. *See Elec. Privacy Info. Ctr. v. U.S. Drug Enforcement Agency*, 192 F. Supp. 3d 92, 101 (D.D.C. 2016) ("In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.").

In their responding memoranda, plaintiffs argue that defendants have failed to meet their burden to establish that four possible sources of records could not productively be further searched, or searched for – (1) records possessed by the providers that hosted or transmitted the "BlackBerry emails" from the first few weeks of Secretary Clinton's tenure; (2) the hard drive of an iMac computer currently in use at the Clintons' residence; (3) the records of Secretary Clinton's correspondents; and (4) emails held on additional mobile devices not recovered. As further explained below, the efforts of the FBI during its investigation to obtain records from these sources were thorough and exhaustive, even though unsuccessful in some instances. Further efforts would sidetrack responsible federal officials, and unrelated third parties, into endless, fruitless, and expensive wild-goose chases through enormous repositories of mostly irrelevant electronic data, including the personal data of tens of thousands of third-party email users and other private citizens. The FRA does not require such a wasteful, unproductive, intrusive effort. Plaintiffs' efforts to force such a project on the government should therefore be rejected.

**A.    Sufficient Efforts Were Made to Recover BlackBerry Emails From Early 2009**

According to plaintiff Cause of Action Institute ("CoA Institute"), "[t]he core dispute at this stage of the litigation concerns the 'BlackBerry emails' from the first three months of Secretary Clinton's tenure."[1]  CoA Inst. Opp. 3; *see also id.* at 7.  CoA Institute argues that, as to the alleged possible "trove" of unrecovered emails in this category, "[u]nder the FRA, the proper course of action in this situation is for Defendants to perform their statutory obligation and initiate an enforcement action through the Attorney General to require BlackBerry Limited (previously known as Research In Motion Limited) and AT&T to recover the records."  CoA Inst. Opp. 7.  Plaintiff apparently contends either that BlackBerry and/or AT&T should undertake forensic recovery efforts, *id.* at 8, or possibly that the government should obtain "access to the relevant servers or back-up systems," *id.* at 9, and engage in such an effort itself.  This request must be rejected for three reasons.

First, there simply is no evidence that there remain any extant "unlawfully removed" records to trigger the statutory duty to request that the Attorney General initiate a recovery action.  *See* 44 U.S.C. § 3106(a).  As explained in the First Declaration of Assistant Director Priestap, in an effort to recover additional "BlackBerry" emails (beyond those already recovered), the FBI obtained grand jury subpoenas seeking information related to accounts with the email addresses hr15@mycingular.blackberry.net and hr15@att.blackberry.net.  First Priestap Decl. ¶ 4.  These subpoenas produced no responsive materials, as the requested data were outside the retention time and/or retention policies utilized by the providers.  *Id.*  Given these representations, there is no evidence that any further inquiry of the service providers would result

---

[1] Specifically, from January 21, 2009, through March 18, 2009.  *See* Declaration of E.W. Priestap, Assistant Director, Counterintelligence Division, FBI ("First Priestap Decl.," ECF No. 33-2), Exh. A, at 20 n.bbb.

in the recovery of any additional Clinton email records or any of the unrecovered "BlackBerry emails."

Plaintiff CoA Institute complains that the information provided in the First Priestap Declaration with regard to the grand jury subpoenas is insufficient because Assistant Director Priestap "does not identify the targets of the purported subpoenas, their exact nature and scope, or even the specificity of their focus on the BlackBerry emails."  CoA Inst. Opp. 1; *see also id.* at 8.  Defendants are seeking for leave to submit *in camera* an *ex parte* declaration providing further details of the subpoenas to establish to the Court's satisfaction the thoroughness of the inquiries made in this regard.[2]  Even without public airing of this material, however, it is clear that plaintiff's attempts to raise questions fall short of establishing any gaps in the FBI's investigation or demonstrating a need for further information in this regard.  Many of plaintiff's questions are clearly irrelevant (*e.g.,* "How many subpoenas were there?"; "Were the response[s] written or oral?" – CoA Inst. Opp. 8).  And, plaintiff's most "crucial[]" question, whether an effort had been made or could be made to forensically recover these emails, is devoid of context. Plaintiff does not cite any authority that would require a third party who has responded to a subpoena by stating that the requested data has not been retained, to attempt to forensically recover the data, or that would allow the government access to its facilities to conduct a forensic recovery effort.

Second, plaintiff's request for a referral to the Attorney General for further action should also be rejected because, even if such a forensic task could be requested or obtained through the

---

[2]  As explained in Defendants' Motion for Leave to Submit *In Camera, Ex Parte* Declaration, portions of the Second Priestap Declaration have been redacted from the publicly filed version to protect information protected by Federal Rule of Criminal Procedure 6(e) and/or by court order.

legal process available to the government and even if a few scraps of email *could* potentially be recovered (and there is no evidence that is so), the minimal results obtained would not justify the burden and expense.  The service providers have stated that they have not retained any records relating to the BlackBerry emails.  Given that millions of records likely passed through any service provider systems during the time period in question, a forensic recovery effort to try to recover non-retained, but somehow still present, bits of emails specific to Secretary Clinton on any media that survive would be like searching for specific grains of sand on a beach and would be similarly fruitless.  A forensic effort to try to recover these emails would be nothing like the more limited forensic task of recovering deleted files *from the Clintons' own server*, which itself was a massive, months-long undertaking.  *See* First Priestap Decl., Exh. A.  Moreover, a forensic search through the records of third-party email providers would intrude on the privacy interests of tens of thousands of non-related users and would be disfavored for that reason as well.

Plaintiff contends that burdensome forensic recovery is nonetheless necessary because the D.C. Circuit's prior decision in this case, *Judicial Watch,* 844 F.3d at 955, requires defendants to establish the "fatal loss" of records and that defendants have failed to do so here.  CoA Inst. Opp. 3, 5.  But real-world "fatal loss" can be established without a complete forensic scouring of all possible media devices.  As NARA explains in the Second Declaration of Laurence Brewer, because agencies do not inventory each piece of information or record created or received by each employee, it is impossible to know the entirety of what may be missing or destroyed and therefore impossible to know when that entirety has been recovered or determined to be irretrievably lost.  Second Brewer Decl. ¶ 13.  However, NARA works closely with agencies to help understand what records may be missing and what can be recovered.  *Id.*  At some point, as here, the results achieved by ongoing efforts diminish to zero, and soon thereafter, as here, NARA

and the agencies can reasonably conclude that, if any records remain, those records are unrecoverable and hence "fatally lost" in all practical senses. Plaintiff's attempt to require achievement of some sort of absolute ideal of "fatal loss" (a phrase which itself is undefined), through a forensic recovery effort for which they provide no legal basis, should be rejected as fanciful.

As NARA explains, the goal of the record recovery process is "to ensure that reasonable efforts are taken to recover improperly removed or destroyed records, to the extent necessary, appropriate, and achievable." Second Brewer Decl. ¶ 8. Spending an extensive amount of time or resources on attempting to recover hypothetical alienated Federal records – many of which are not likely to be permanent Federal records – would not be an efficient or reasonable exercise, given that by the time any extant records were recovered, they could be destroyed in accordance with the records disposition schedule. *Id.* ¶ 14. Indeed, NARA reports that "it is not common for agencies to take additional steps like the use of forensic technology to recover records from retired devices." *Id.* ¶ 12. Notably, the Clinton email recovery effort has, overall, exceeded NARA's expectations in this regard. Further, as noted above, it is not evident in this instance that additional forensic efforts could be legally authorized, or could recover *anything*, let alone anything of archival value, from the facilities of global email providers such as AT&T and BlackBerry. In light of these considerations, further efforts cannot be justified.

Third, CoA Institute's request for relief as to these emails should be rejected because it cannot obtain a specific type of referral under the FRA, as it purports to do here by asking for enforcement action by the Attorney General specifically *against BlackBerry and AT&T*. CoA Inst. Opp. 7. The applicable sections of the FRA, 44 U.S.C. § 2905(a) and § 3106, require only that the agency head or the Archivist "shall request the Attorney General to initiate" an "action

for the recovery of records unlawfully removed and for other redress provided by law." Nothing in the FRA grants the Court, or plaintiff, the authority to dictate what the Attorney General should or should not do upon receiving such a request from an agency or NARA. At most, the Court can only direct NARA or an agency to make a request – the judicial role ends there. The Attorney General has prosecutorial discretion as to how to proceed from that point, and his decision is not subject to review by this Court. *See Wayte v. United States*, 470 U.S. 598, 607 (1985) ("The Attorney General "retain[s] broad discretion to enforce" the laws of the United States.); *Morris v. Gressette*, 432 U.S. 491, 500-01 (1977) (holding that the Attorney General's exercise of discretion under § 5 of the Voting Rights Act is judicially unreviewable); *In re Sealed Case*, 131 F.3d 208, 214 (D.C. Cir. 1997) ("In the ordinary case, the exercise of prosecutorial discretion . . . has long been held presumptively unreviewable."); *see also* 5 U.S.C. § 701(a)(2) (no review under the Administrative Procedure Act where "agency action is committed to agency discretion by law"); *Heckler v. Chaney*, 470 U.S. 821, 832 (1985) ("agency refusals to institute investigative or enforcement proceedings" are presumed immune from judicial review under 5 U.S.C. § 701(a)(2)).

In sum, plaintiff's attempts to force the Court to order a forensic recovery action as to the BlackBerry emails should be rejected. CoA Institute has not identified any legal authority requiring such an action or permitting the government to demand such an action. In any event, there simply is no "trove" of unrecovered BlackBerry emails reasonably susceptible to forensic recovery efforts, as CoA Institute would like to believe. CoA Inst. Opp. 7-8. Accordingly, referral would be pointless, and plaintiffs' claims as to these emails are moot. *Judicial Watch*, 844 F.3d at 956 (agreeing that this case might be moot as to the emails from former Secretary Clinton's Blackberry account "if a referral were pointless"). In the alternative, and for the same

reasons, defendants are entitled to summary judgment because they have satisfied their duties under the FRA.

**B.    Sufficient Efforts Were Made to Examine a Successor Hard Drive (the iMac Drive)**

CoA Institute also questions the search performed of the so-called "iMac hard drive" at the Clinton residence. CoA Inst. Opp. 9-17. As explained in defendants' prior brief and declarations, this hard drive was never itself used to house Secretary Clinton's email during her tenure. First Priestap Decl. ¶ 7; *id.*, Exh. A, at 4-5. Rather, it was a successor to the original private server located at Secretary Clinton's Chappaqua residence (the "Apple Server"[3]), which was, briefly, the server used to house Secretary Clinton's email system. First Priestap Decl. ¶¶ 5, 6; *id.*, Exh. A, at 4-5. When the "Pagliano Server"[4] replaced the "Apple Server" as Clinton's private email server system in March 2009, Clinton's former staff believed all email on it was migrated to the new server, and that no email content should have remained on the Apple Server. First Priestap Decl. ¶ 6; *id.*, Exh. A, at 4. Following the email migration, the equipment that had served as the Apple Server was repurposed to serve as a personal computer for household staff at Clinton's Chappaqua residence. First Priestap Decl. ¶ 6; *id.*, Exh. A, at 4. Then, sometime in 2014, certain data from the repurposed Apple-Server-turned-personal-computer was transferred to a new Apple iMac computer, and the hard drive of the old Apple Server/personal computer was subsequently destroyed. First Priestap Decl. ¶ 6; *id.*, Exh. A, at 4-5. It is the hard drive of the *new* Apple iMac that is at issue in this part of CoA Institute's brief.

---

[3] The "Apple Server" consisted of an Apple Power Macintosh G4 or G5 tower (containing, *inter alia*, a hard drive or drives) and an HP printer. First Priestap Decl., Exh. A, at 3.

[4] The "Pagliano Server" is described on page 4 of Exhibit A to the First Priestap Declaration.

The FBI did not seek to obtain the iMac hard drive itself for forensic review because the investigation revealed the device itself was not used to house Secretary Clinton's email during her tenure, and there was no investigative reason to believe that any email from the original Apple Server would have survived the first migration (when data was moved off of the Apple Server to the Pagliano Server), and then been included in the second migration so as to make it onto the iMac hard drive.  *See* First Priestap Decl. ¶ 7.  Nevertheless, at the request of the FBI, the Department of Justice requested that Williams & Connolly LLP, Clinton's private counsel, coordinate a review of all data on the iMac hard drive to ensure there were no extant Clinton tenure emails, through a keyword search consisting of terms identified by the FBI.  *Id.*  Williams & Connolly subsequently confirmed to the Department of Justice that a review of the iMac hard drive was conducted pursuant to this request, and no emails were found belonging to Secretary Clinton from the period during which she served as Secretary of State.  *Id.*

CoA Institute complains that the FBI itself did not do a forensic analysis of the iMac's hard drive, but instead relied on Williams & Connolly to conduct a search.  CoA Inst. Opp. 2, 6. Again, plaintiff does not identify under what legal authority the FBI could have obtained the hard drive to do so such an analysis, given how unlikely it was to have contained any emails, nor does plaintiff explain what authority the Attorney General would have to do so in these circumstances pursuant to a referral for action under the FRA.

In any event, the remote possibility that a forensic effort would recover anything, combined with the intrusiveness on third parties' interests that would be entailed, would preclude any such compelled forensic examination.  As explained above, the object at issue, the iMac hard drive, never was a component of Secretary Clinton's email system.  Any 2009 data from that email system on it would therefore have had to, somehow, have been *inadvertently* migrated

from the Apple Server's hard drive, which had itself already been reformatted and repurposed through the installation of an Apple Operating System prior to transferring data onto the iMac. Williams & Connolly's search of the iMac drive established that no email remained in a searchable format. Plaintiff is now speculating that unformatted and unindexed 2009 email data may somehow be present as hidden or unrecovered files on the iMac hard drive. But plaintiff's speculation about such a remote possibility does not establish that it would have been reasonable to search further.

In light of these factors, the FBI had no legal basis to attempt to obtain the iMac hard drive for further searching, and State and NARA in turn reasonably determined that there is no reason to believe there are federal records left to be recovered from the iMac. CoA Institute's insistence that further efforts are needed in this regard should be rejected.

CoA Institute dismisses State and NARA's determinations as based on "inadmissible hearsay." CoA Inst. Opp. 2, 9-17. Plaintiff asserts that State and NARA are improperly relying on hearsay-within-hearsay contained in the FBI report, which hearsay is not subject to any evidentiary exception, and that the FBI report "itself is not intended to establish the validity of the information it contains." *Id.* at 2. Plaintiff, however, points to nothing in the FRA or the relevant case law that requires the agency and NARA to rely solely on evidence that would be admissible in federal court when determining that a referral to the Attorney General for recovery of federal records would be pointless. The statutory scheme and case law are in fact to the contrary, and agencies and NARA have enforced the FRA for decades by relying on communications and supporting documentation that do not necessarily meet a legal, evidentiary standard of reliability or proof. Second Brewer Decl. ¶¶ 9-10.

Under the FRA, an agency's obligation to initiate action through the Attorney General for the recovery of records arises only if "the head of the Federal agency knows or has reason to believe" that records have been unlawfully removed.  44 U.S.C. § 3106(a).  The statute itself leaves it to the agency to determine whether there is knowledge or a reason to believe that records exist to be recovered and places no evidentiary limitations on how that determination is made.  And the standard is simply that the agency knows "or has reason to believe" that there are records to be recovered, *id.*; the agency is not required to prove as much in a court of law.

NARA's and State's reliance on evidentiary "hearsay" to make this determination is therefore fully consistent with the FRA and with their general practices.  *See* Second Brewer Decl. ¶¶ 9-10; *see also* Second Stein Decl. ¶ 4.  It is, moreover, consistent with general administrative practice across the government.  *See Richardson v. Perales*, 402 U.S. 389, 410 (1971) (holding that hearsay consultants' reports are admissible in disability hearings); *Honeywell Int'l, Inc. v. EPA*, 372 F.3d 441, 447 (D.C.Cir.2004) (concluding that EPA had an adequate basis for its determination, despite the fact that its only evidence was two hearsay statements relayed to the agency by its contractor , because given their responsibilities, the hearsay declarants "were uniquely in a position to know" the relevant information (citation and internal quotation marks omitted)); *EchoStar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002) ("[I]t is well-settled not only that hearsay can be considered by an administrative agency but that it can constitute substantial evidence."); *Crawford v. U.S. Dep't of Agric.*, 50 F.3d 46, 49 (D.C. Cir. 1995) ("[A]dministrative agencies may consider hearsay evidence as long as it 'bear[s] satisfactory indicia of reliability.'"); *cf.* 5 U.S.C. § 556(d) ("Any oral or documentary evidence may be received in an administrative hearing.")  The case law cited by

plaintiff to the contrary (CoA Inst. Opp. 10-11) pertains to what evidence a party can rely on *in court*, not what evidence an agency can rely on to make administrative decisions.

Notably, the limited role for private litigation in enforcing the FRA would be undermined by plaintiff's standard of proof.  Congress "decided to rely on administrative enforcement, rather than judicial review at the behest of private litigants, to prevent the destruction or removal of records" under the FRA.  *Armstrong v. Bush*, 924 F.2d 282, 294 (D.C. Cir. 1991).  The D.C. Circuit made it quite clear in *Armstrong* that Congress did not expect federal courts to oversee agency recordkeeping; to the contrary, Congress was "'mindful of the protracted private litigation' involved in the *Kissinger* case," and amended the FRA following the Supreme Court's decision in *Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136 (1980), in order to "strengthen the administrative enforcement mechanism rather than explicitly sanctioning litigation at the behest of private citizens."  *Armstrong*, 924 F.2d at 294 (quoting H.R. Rep. No. 98-1124, at 28 (1984)).  The Court concluded that "it would clearly contravene this system of administrative enforcement to authorize private litigants to invoke federal courts to prevent an agency official from improperly destroying or removing records."  *Id.*  The Court's analysis in *Armstrong* thus recognized that while agencies and NARA are not permitted to authorize the unlawful destruction of federal records, Congress declined to subject all agency recordkeeping to searching and ongoing judicial scrutiny at the behest of private litigants.  The Court said nothing about what level of proof would be required to support such a determination and nothing in the opinion supports the standard that plaintiff proposes – evidence admissible in court – which would be inconsistent with the discretion that agencies and NARA retain and the limited role for private litigation in enforcing the FRA.

Thus, consistent with the FRA and case law interpreting it, federal agencies and NARA have historically relied on information gathered in the form of unsworn letters and reports in determining whether there is reason to believe there are records to be recovered under the FRA. Second Brewer Decl. ¶¶ 6-10.  When gathering information from an agency in order to provide the oversight and advice under the FRA's administrative enforcement scheme, NARA does not require that the agency provide NARA with evidence that meets a legal, evidentiary standard of reliability or proof.  *Id*. ¶¶ 10-11; *see also* Second Stein Decl. ¶ 4 ("The [State] Department routinely relies on the representations of individual employees, and where necessary, outside entities or third parties, in carrying out its responsibilities under the" FRA "and does not require that evidence of compliance with the FRA be provided in a form that would be admissible in court.").  In the present case, consistent with this practice, when each agency reached its determination that it does not know or have reason to believe that recoverable Clinton email records remain extant, each agency relied on its review of the publicly available, unclassified version of the *Clinton E-Mail Investigation: Mishandling of Classified – Unknown Subject of Country (SIM)* Letterhead Memorandum issued by the Federal Bureau of Investigation and dated July 2016 (Exhibit A to the First Priestap Declaration), and the information included in the First Priestap Declaration.  Second Brewer Decl. ¶ 3; Second Stein Decl. ¶ 3; *see also* First Brewer Decl. ¶ 4; First Stein Decl. ¶ 3.  Although these representations are not sworn statements admissible as evidence at trial, State and NARA are within their discretion to use them as the bases to determine that there is no reason to believe that there are any federal records to be recovered.  Second Brewer Decl. ¶ 3; Second Stein Decl. ¶ 4.

CoA Institute also complains that, in relying on the representations of Williams & Connolly personnel, the FBI relied on persons "representing the interests of Secretary Clinton,

the target of the FBI criminal investigation," who were not subject to "any forcible process available to the Attorney General or other government agencies." CoA Inst. Opp. 10. Plaintiff argues that the information is therefore "inherently untrustworthy." *Id.* at 13-14. CoA Institute also points out that the report itself contains a disclaimer, that "it is not intended to address . . . the validity of the information related herein." *Id.* at 14. However, NARA explains that it is usual for it to rely on agency reports of various sorts "as truthful and sufficient in closing out allegations of unauthorized destruction or removal of Federal records." Second Brewer Decl. ¶ 10. And "NARA assumes that the representations of agencies and third parties are made in good faith and does not demand evidence from them in a form that would be admissible in court." *Id.* In particular, NARA also relies on statements of former federal employees who cooperate with their former employer in returning missing federal records and assumes such statements to be made in good faith. *Id.* Here, former Secretary Clinton and her representatives have been fully cooperative with efforts to recover her tenure emails. Thus, NARA's and State's reliance on the FBI reports and declarations, and on representations by Williams & Connolly and others, with regard to the possibility of federal record emails on the iMac hard drive, is fully consistent with normal practice in FRA matters, and to require anything more would contradict this Circuit's clear dictate that FRA compliance is to be primarily an administrative matter.

### C.    Sufficient Efforts Were Made to Recover Emails from Secretary Clinton's Correspondents

Plaintiff Judicial Watch argues that defendants should make additional efforts to recover Secretary Clinton's emails from "persons who received or sent e-mails to Secretary Clinton." JW Opp. 4. Plaintiff provides a list of 138 persons outside the State Department with whom there is evidence, through recovered emails, that Secretary Clinton did communicate. *Id.* at 5. Plaintiff argues that "[t]here is a high degree of probability that at least some of the emails not

yet recovered were sent between at least some of these individuals and Secretary Clinton." *Id.* Plaintiff criticizes the FBI for failing to pursue this avenue. *Id.*

Plaintiff's surmise that the identified individuals might have additional, unrecovered Clinton emails is, however, entirely speculative and insufficient to warrant an intrusive request of the (mostly) private persons identified. Further, plaintiff is wrong about the FBI's efforts in this regard. In the course of its investigation, the FBI interviewed Secretary Clinton's most frequent correspondents and obtained copies of email correspondence that some of these individuals had with Secretary Clinton during her tenure. Second Priestap Decl. ¶ 4. Judicial Watch points to no evidence that further unrecovered emails do exist in the accounts of individuals with whom Secretary Clinton communicated much more sporadically. As NARA explains, the FBI's efforts more than satisfy FRA requirements – "it is not common for agencies . . . to survey non-Federal employee recipients of emails to determine if they have copies of extant emails." Second Brewer Decl. ¶ 12.

Judicial Watch also cites FBI notes discussing the possible existence of "thousands of emails" between Secretary Clinton and David Petraeus and between Secretary Clinton and CENTCOM. JW Opp. 6. As an initial matter, although the notes are not clear, it would appear from the brief description that any such emails between former Secretary Clinton and General Petraeus have always been in the Department of Defense's recordkeeping systems. Second Stein Decl. ¶ 5. Moreover, Mr. Stein explains that, to his knowledge, those numbers are incorrect. *Id.* ¶ 6. Rather, when CENTCOM conducted a specific search to identify emails sent by or received from Secretary Clinton, the search results yielded 18 responsive documents, each of which was a version or copy of an email thread between former Secretary Clinton and then-Commander of CENTCOM David Petraeus that had previously been provided to the State Department. *Id.*

Those 18 documents are now also in the possession of the State Department. *Id.* There is no evidence that any additional emails between Secretary Clinton and Mr. Petraeus and/or CENTCOM exist.

In short, as NARA explains, the goal of the record recovery process is "to ensure that reasonable efforts are taken to recover improperly removed or destroyed records, to the extent necessary, appropriate, and achievable." Second Brewer Decl. ¶ 8. That goal has been met here with regard to possible emails between Secretary Clinton and non-frequent non-governmental correspondents.

### D. Sufficient Efforts Were Made to Obtain Secretary Clinton's Mobile Devices

CoA Institute also questions the FBI's unsuccessful efforts to recover thirteen mobile devices and two iPads identified as having been used by former Secretary Clinton to send email from her nongovernmental email account. CoA Inst. Opp. 16. Plaintiff suggests that the FBI should have "issued subpoenas or otherwise questioned" the users of these devices. *Id.*

In the course of the FBI investigation, Williams & Connolly reported that it was unable to locate the thirteen mobile devices. First Priestap Decl., Exh. A, at 9. In addition, with regard to these mobile devices, Secretary Clinton stated that her assistants disposed of old SIM cards associated with replaced mobile devices, and one of her assistants remembered physically destroying two mobile devices. *Id.* And, with regard to the iPads, two of three iPads that were recovered had no emails on them, and one recovered iPad had three draft emails. *Id.* In light of Williams & Connolly's representations, the testimony, and the results from the three recovered iPads, the FBI reasonably concluded that any further efforts to recover the old mobile devices, as well as the two iPads, would be unproductive. *See* First Priestap Decl. ¶¶ 11-13; *id.*, Exh. A, at 9. Plaintiff does not explain why it believes that additional efforts would be worthwhile. In the

absence of any reason to believe that additional devices with email on them could be located, it is nonsensical to require the government to exert further resources on this avenue.

## II.    DISCOVERY IS UNWARRANTED IN VIEW OF THE DETAILED FBI REPORT AND THE DECLARATIONS SUBMITTED IN THIS CASE

Finally, CoA Institute seeks discovery to determine the extent of the federal government's purported efforts to recover the BlackBerry emails and adequately search the iMac hard drive. CoA Inst. Opp. 19-26. But, as described above, the information provided by the FBI more than satisfies NARA's standards as to what are sufficient representations to close out allegations of unauthorized destruction or removal of federal records. Therefore, discovery to obtain further information about the details of those efforts is unnecessary. CoA Institute's request should be accordingly denied as unwarranted, unduly burdensome, and not relevant to this administrative record review case.

First, plaintiff has pointed to no evidence that additional federal records exist. Rather, it seeks discovery to try to *find* such evidence based on its speculation that such records *must* exist and its mistaken belief that "fatal loss" is not measured by the limitations of the ordinary world. But "[d]iscovery to pursue a suspicion or a hunch is unwarranted." *Physicians Comm. for Responsible Med. v. Glickman*, 117 F. Supp. 2d 1, 4 (D.D.C. 2000). "[A] request for jurisdictional discovery cannot be based on mere conjecture or speculation." *FC Inv. Group LC v. IFX Markets, Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008); *see also Bastin v. Fed. Nat'l Mortgage Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997) ("The district court does not abuse its discretion when it denies a discovery request that would amount to nothing more than a fishing expedition."). Moreover, the FBI investigation speaks for itself – plaintiff should not be allowed to use its speculative allegations that additional records should exist to probe into the details about that investigation. *See Leyh v. Modicon, Inc.*, 881 F. Supp. 420, 425-27 (S.D. Ind. 1995)

(holding that employee would not be allowed to depose EEOC investigator about his recollection of facts turned up in his investigation of employee's complaint).

Second, the burden of the proposed discovery would outweigh any incidental benefit gained.  Plaintiff seeks leave to propound an unspecified number of document requests and 25 interrogatories and to take four depositions.  *See* Proposed Order Granting CoA Inst.'s Mot. for Discovery (ECF No. 35-4).  Discovery must be "proportional to the needs of the case, considering . . . whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  Here, the burden of responding to plaintiff's discovery is not justified by the incremental, if any, information to be gained.  It bears repeating that the FBI has already conducted an extensive investigation and published a thorough and detailed report. Given this record, it is unlikely that any further details uncovered by plaintiff through discovery would be of any significance.  In addition, many of the details plaintiff seeks (such as those related to the grand jury activities) are subject to privilege or prohibited by law from disclosure, and therefore discovery as to those details would be futile.  For these reasons as well, discovery should be denied.  *See Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp*., 296 F.R.D. 1 (D.D.C. 2013) (holding that the benefit of discovery relating to the identity and conduct of certain corporate actors requested by operator of Internet based television service was outweighed by burden and expense it would inflict upon cable television network and third parties identified as potential deponents in antitrust action); *Slate v. Am. Broadcasting Cos., Inc.*, 802 F. Supp. 2d 22, 26 (D.D.C. 2011) (Magistrate Judge reasonably concluded that the burden and expense of wading through files on hard drives outweighed any benefit where a majority of the files on the drives were of limited relevance and where a large number of the files contain confidential and personal information of unrepresented non-parties).

Third, in the event the Court concludes that this case is not moot, review on the merits is essentially review of an administrative decision – in this case, NARA's and State's determination that they do not know or have reason to believe that further records exist that remain to be recovered. Judicial review of agency action is generally confined to the administrative record as designated by the agency. *See James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996). Courts generally do not allow parties to supplement the record or to conduct discovery, "'unless they can demonstrate unusual circumstances justifying a departure from this general rule.'" *City of Dania Beach v. F.A.A.*, 628 F.3d 581, 590 (D.C. Cir. 2010) (quoting *Tex. Rural Legal Aid v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)). In this Circuit,

> the record can be supplemented in three instances: (1) if the agency "deliberately or negligently excluded documents that may have been adverse to its decision," (2) if background information was needed "to determine whether the agency considered all the relevant factors," or (3) if the "agency failed to explain administrative action so as to frustrate judicial review."

*City of Dania Beach*, 628 F.3d at 590 (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). None of these exceptions applies here. There is no evidence that the agencies or the FBI have "deliberately or negligently" excluded documents and plaintiffs are not arguing that "background information" is needed. And, to the extent the agency has failed to explain or justify its actions, review is not frustrated – rather, if the Court finds that NARA's and State's determinations are not supported, the FRA provides that the proper step is to require the agencies to comply with the FRA (by initiating an enforcement action), not to order discovery.

In sum, discovery would be unlikely to find additional useful information in light of the fact that a thorough FBI investigation has already been completed, would be burdensome and encompass much privileged material, and, ultimately, would be beside the point.

## CONCLUSION

For the reasons set forth above and in defendants' prior memorandum, the Court should dismiss both Complaints for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) or, in the alternative, should grant summary judgment for defendants under Federal Rule of Civil Procedure 56.  The Court should deny plaintiffs' cross-motions for summary judgment and cross-motion for discovery.

Dated:  June 23, 2017                          Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Director

MARCIA BERMAN
Assistant Director

*/s/ Carol Federighi*
CAROL FEDERIGHI
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044
Phone: (202) 514-1903
Email: carol.federighi@usdoj.gov

*Counsel for Defendant*