## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **JUDICIAL WATCH, INC.,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 15-785 (JEB)** |
| **REX W. TIILLERSON, in his official capacity as U.S. Secretary of State,** | |
| **Defendant.** | |
| ------------------------------------------------------- | |
| **CAUSE OF ACTION INSTITUTE,** | |
| **Plaintiff,** | |
| v. | |
| **REX W. TILLERSON, in his official capacity as U.S. Secretary of State, and** | **Civil Action No. 15-1068 (JEB)** |
| **DAVID S. FERRIERO, in his official capacity as U.S. Archivist,** | |
| **Defendants.** | |

## MEMORANDUM OPINION

A full year has now passed since the 2016 presidential election, but the controversy over Hillary Clinton's emails endures. As readers well remember, Clinton used private email accounts and servers during her tenure as Secretary of State. When news first broke that those accounts were employed to "conduct official government business," Plaintiffs Judicial Watch and Cause of Action became concerned that the Government might not have retained records of her emails. See JW Compl., ¶ 5; CAI Compl., ¶ 9. To spur recovery, each filed a separate suit alleging violations of the Federal Records Act, "a collection of statutes governing the creation,

management, and disposal of federal records." Public Citizen v. Carlin, 184 F.3d 900, 902 (D.C.

Cir. 1999).   Plaintiffs argued that pursuant to the statutory scheme, Defendants State Department

and the National Archives and Records Administration (NARA) must enlist the Attorney

General's aid in recovering Clinton's emails.

In the parties' first consolidated foray before this Court, the Government moved to

dismiss the case as moot, arguing that it had done all that the FRA requires.   The Court took the

bait, holding that because Defendants had already taken significant steps to recover the emails,

Plaintiffs suffered no ongoing injury.   The Court of Appeals reversed and, in doing so,

established a higher hurdle for Defendants to clear.   Namely, they must initiate action with the

Attorney General unless they either recover all the missing emails or "establish their fatal loss."

Judicial Watch, Inc. v. Kerry, 844 F.3d 952, 956 (D.C. Cir. 2016).   On remand, the

Administration may have changed, but the Government's stance remains the same.   Relying on

new evidence of their additional efforts to track down the Clinton emails, Defendants play the

mootness card once more.   Based on that supplemented record, the Court again agrees the suit is

moot and therefore grants their Motion to Dismiss.

## I.      Background

Plaintiffs are two non-profit organizations, which describe themselves as dedicated to

promoting "transparency, accountability, and integrity in government."   JW Compl., ¶ 3; see also

CAI Compl., ¶ 21.   After learning of Clinton's private email accounts, both organizations

believed that the Secretary had unlawfully removed federal records from the State Department.

See JW Compl., ¶ 5; CAI Compl., ¶ 9.   Judicial Watch therefore filed suit on May 2015, and

Cause of Action joined the mix two months later.   See Minute Order of August 4, 2015 (granting

Government's Motion to Consolidate Cases).   Plaintiffs claimed principally that the State

Department had failed to retain agency records in violation of the Federal Records Act, such that the current Secretary of State must "initiate action through the attorney general to recover the Clinton emails." JW Compl., ¶¶ 7, 29; see also CAI Compl., ¶¶ 16-17, 68.

This Court dismissed Plaintiffs' suit as moot. See Judicial Watch, Inc. v. Kerry, 156 F. Supp. 3d. 69, 73 (D.D.C. 2016). To proceed, it reasoned, Plaintiffs must allege an ongoing injury under the FRA, which they could do only if the Secretary and Archivist had been "'unable or unwilling' to recover emails that might be federal records." Id. at 76. As it happened, both NARA and State had already recovered nearly 55,000 pages of Clinton emails and were partnering with the Federal Bureau of Investigation to search for more. Id. at 76-77. Under this Court's interpretation of the statute, Defendants' sustained efforts sufficed to alleviate any injury. Id. at 77.

The Court of Appeals reversed, applying a mootness test with more teeth. See Judicial Watch, Inc. v. Kerry, 844 F.3d 952, 953 (D.C. Cir. 2016). It allowed that "actions taken by the Department and the FBI might have mooted appellants' claims by securing custody of all emails that the Attorney General could have recovered in an enforcement action." Id. at 955 (emphasis added). Although the tag-team efforts "bore some fruit," the court believed that "shaking the tree harder . . . might [] bear more still." Id. In so holding, the Court of Appeals mentioned that the FBI had recovered a server and thumb drive housing emails from one of Clinton's nongovernmental email addresses. Id. If Plaintiffs had "sought emails from [that] server account" only, the court noted, a mootness argument "might well succeed." Id. But Clinton had used a second nongovernmental address, a Blackberry account, during her first weeks in office. Id. at 955-56. The record showed no effort by the State Department or FBI to recover those emails. Id. The Court of Appeals thus held that the controversy remained live "[a]bsent a

3

showing that the requested enforcement action could not shake loose a few more emails." Id. at 955.  It acknowledged, however, that Defendants had taken actions subsequent to this Court's initial decision, permitting them to raise mootness once again on remand.  Id. at 956-57.

Now back for round two, Defendants accept the invitation and renew their Motion to Dismiss on mootness grounds.  See MTD (ECF No. 33).  To that end, they have supplemented the record previously before this Court and detailed their more recent attempts to recover the remaining emails.  That effort includes piggybacking on a parallel investigation by the FBI, which sought all of Clinton's work-related emails (with a particular emphasis on the Blackberry ones) to assess whether she had mismanaged classified information.  See, e.g., id., Exhs. 1-4.  As of June 15, 2017, the FBI has turned over all recovered records to the State Department.  See Supp. Declaration of E.W. Priestap, ¶ 12.  Defendants consequently conclude that they have no "reason to believe that recoverable Clinton email records remain extant."  Gov't Reply, Exh. 1 (Second Declaration of Lawrence Brewer), ¶ 3; see also id., Exh. 2 (Second Declaration of Eric F. Stein), ¶ 3.

## II.    Legal Standard

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff bears the burden of proving that the Court has subject-matter jurisdiction to hear its claims.  See DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 342 & n.3 (2006); Arpaio v. Obama, 797 F.3d 11, 19 (D.C. Cir. 2015).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  "For this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13-14 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal

Practice and Procedure § 1350 (2d ed. 1987)).  Additionally, unlike with a motion to dismiss

under Rule 12(b)(6), the Court "may consider materials outside the pleadings in deciding

whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharms., Inc. v.

FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### III.    Analysis

Plaintiffs' suits contend that Defendants must initiate action through the Attorney

General to recover Secretary Clinton's emails, which they allege are "federal records" under the

FRA.  See CAI Compl., ¶¶ 35-37.  In seeking dismissal, Defendants rejoin that the actions are

now moot, as they have already recovered all extant emails and thus need not invoke the

Attorney General's aid.  Alternatively, Defendants ask the Court to grant summary judgment in

their favor on the merits.  Plaintiffs not only oppose Defendants' Motion, but they cross-move

for summary judgment themselves.  See ECF Nos. 37 (JW), 38 (CAI).  Cause of Action also

moves for jurisdictional discovery to aid it in establishing the Court's subject-matter jurisdiction,

see ECF No. 38, and adds a Motion to Strike Defendants' chief declaration in support of their

mootness argument.  See ECF No. 54.

The Court's analysis begins by outlining the FRA, proceeds to examine mootness, and

concludes with a look at jurisdictional discovery.  It need not reach the summary-judgment

dispute.

### A.  The Federal Records Act

The FRA requires heads of federal agencies to "make and preserve records containing

adequate and proper documentation of the organization, functions, policies, decisions,

procedures, and essential transactions of the agency."  44 U.S.C. § 3101.  Each agency head shall

also "establish safeguards against the removal or loss of records the head of such agency

determines to be necessary and required by regulations of the Archivist," the head of the

National Archives and Records Administration.  Id. § 3105.

When those safeguards fail, the Act sets forth a structure whereby the Archivist and

agency heads are to work together to ensure that no documents are unlawfully destroyed.  Each

agency head

> shall notify the Archivist of any actual, impending, or threatened
> unlawful removal, defacing, alteration, corruption, deletion, erasure,
> or other destruction of records in the custody of the agency, and with
> the assistance of the Archivist shall initiate action through the
> Attorney General for the recovery of records the head of the Federal
> agency knows or has reason to believe have been unlawfully
> removed from that agency, or from another Federal agency whose
> records have been transferred to the legal custody of that Federal
> agency.

Id. § 3106.  The Act also includes a check against recalcitrant agencies.  If the agency head does

not enlist the Attorney General, "the Archivist shall request the Attorney General to initiate such

an action, and shall notify the Congress when such a request has been made."  Id.  And if both

the agency head and Archivist "fail[] to initiate remedial action in a timely manner, private

litigants may sue under the APA to require them to do so."  CREW v. U.S. Dep't of Homeland

Sec., 527 F. Supp. 2d 101, 110 (D.D.C. 2007) (citation and quotation marks omitted).

Notwithstanding the statute's mandatory language, the D.C. Circuit has made clear that

the agency need not "initially attempt to prevent the unlawful action by seeking the initiation of

legal action."  Armstrong v. Bush, 924 F.2d 282, 296 n.12 (D.C. Cir. 1991).  "Instead, the FRA

contemplates that the agency and Archivist may proceed first by" taking their own "intra-agency

actions."  Id.  In this case, the Court of Appeals affirmed that "an agency might reasonably

attempt to recover its records before running to the Attorney General."  Judicial Watch, 844 F.3d

at 956.  The agency must initiate the referral process, however, if "those initial efforts failed to recover all the missing records (or establish their fatal loss)."  Id.

B.  Mootness

At this stage, the Government assumes that Clinton's emails are federal records and were unlawfully removed from the agency.  See MTD at 5 n.3.  It nevertheless contends that its subsequent recovery efforts have mooted the suit.  As the Supreme Court has explained time and again, a court "may only adjudicate actual, ongoing controversies."  Honig v. Doe, 484 U.S. 305, 317 (1988).  "To save a case from mootness the ongoing injury must be more than a remote possibility, not conjectural, [and] more than speculative."  Liu v. INS, 274 F.3d 533, 535 (D.C. Cir. 2001) (quotation marks and citations omitted).  "Where the plaintiff has recovered all it sought, no court action can provide further relief and the case is moot."  Judicial Watch, 844 F.3d at 954.

The Court of Appeals has provided a road map for the mootness inquiry in this case.  To wit, this Court must start from the premise that Plaintiffs seek to "assur[e] government recovery of emails."  Id. at 955.  So long as referral to the Attorney General might recover "a few more emails," Plaintiffs have not "been given everything [they] asked for."  Id. (quoting Noble v. Sombrotto, 525 F.3d 1230, 1241 (D.C. Cir. 2008)).  The case is moot, however, if Defendants have already "secur[ed] custody of all emails that the Attorney General could have recovered in an enforcement action."  Id.  To evaluate whether that is so, the Court first surveys exactly which emails went missing.  Heeding the D.C. Circuit's instructions, it then asks whether Defendants have successfully recovered those emails or otherwise established their fatal loss.

## 1. *The Missing Emails*

Although "the Clinton emails" have taken on a larger-than-life role in our political discourse, precision in their description is often lacking.  The Secretary's emails came from different accounts and were stored on different servers.  The common thread: the accounts and servers were <u>private</u>.  As the Court of Appeals highlighted, Clinton "used two nongovernmental email addresses" while at State.  <u>Judicial Watch</u>, 844 F.3d at 955.  Before her swearing in, she primarily maintained a Blackberry email account (hr15@mycingular.blackberry.net, and then, presumably after AT&T's 2007 acquisition of Cingular, hr15@att.blackberry.net).  <u>See</u> First Priestap Decl., ¶ 4.  By January 2009, she had decided to transition to a new private domain, clintonemail.com.  <u>Id.</u>, Exh. A (FBI Report) at 3.  She created the latter account on January 13, 2009 (before she assumed office), and used it as her "primary e-mail" by mid-to-late January. <u>Id.</u>  The Secretary apparently sent and received a few scattered emails on the Blackberry account during the subsequent weeks, but by March 18, 2009, the FBI detected no further communications from that domain.  <u>Id.</u>

In addition to private email accounts, Clinton also used private email <u>servers</u> while at State.  An email server is akin to a virtual post office and moves messages from a sender to its intended recipient.  In 2007, an aide to former President Bill Clinton purchased an Apple OS X Server (Apple Server) "for the sole purpose of hosting e-mail services for President Clinton's staff."  <u>Id.</u> at 2.  The Clintons maintained that server in the basement of their Chappaqua, New York, residence.  <u>Id.</u> at 4.  The Apple Server "initially hosted the domains presidentclinton.com and wjcoffice.com," which were used exclusively by Bill Clinton's staff.  <u>Id.</u> at 3 & n.f.  It also hosted clintonemail.com accounts for at least two Clinton staffers.  <u>Id.</u> at 4.  It is not clear

whether Hillary Clinton ever linked her email accounts to this server.  <u>Id.</u> (describing conflicting

reports as to whether Clinton linked her clintonemail.com domain).

Around January 2009, the staff deemed the Apple Server too antiquated to meet their

demands and replaced it with one set up by a former campaign worker, Bryan Pagliano (the

Pagliano Server).  <u>Id.</u> at 3.  Pagliano installed the latter sever in March 2009, and Clinton used it

throughout her tenure at State to host her clintonemail.com account.  <u>Id.</u> at 4-5.  Pagliano

transferred emails from the Apple Server to the newer edition and believes no email content

remained on the old one.  <u>Id.</u> at 4.  The Apple Server was then repurposed as a personal computer

for household staff, before the Clintons discarded it in 2014.  <u>Id.</u>

In July 2013, Clinton transitioned to a third server, the Platte River Networks (PRN)

server, which was run by a third-party vendor in Secaucus, New Jersey.  Once again, the staff

migrated all emails from the Pagliano Server to the PRN one.  <u>Id.</u> at 6.  The Secretary used this

latest server exclusively <u>after</u> her departure from the State Department until October 3, 2015,

when she voluntarily produced it to the FBI.  <u>Id.</u> at 6-7.  For those keeping track, then, Clinton

used two relevant email domains (Blackberry and clintonemail.com) and at least two private

servers (the Pagliano Server and the PRN Server), with the possibility of a third (the Apple

Server).

Clinton also used a series of personal, rather than State-issued, mobile devices.  The FBI

found thirteen such phones, eight of which she apparently used while at State.  <u>Id.</u> at 8.

According to Clinton aides, "[I]t was not uncommon for Clinton to use a new Blackberry for a

few days and then immediately switch it out for an older version with which she was more

familiar."  <u>Id.</u> at 9.  Whenever Clinton moved to a new device, aides would dispose of the older

SIM cards.  <u>Id.</u>  In at least two instances, a Clinton aide destroyed the discarded phones "by

breaking them in half or hitting them with a hammer." Id.  In addition to the mobile devices,

Clinton used up to five different personal iPads, which she used to send emails from her

clintonemail.com domain.

### 2. The Recovery Effort

Given Clinton's use of private email accounts and servers, the Court assumes that at least

some federal records were improperly maintained outside the agency, in violation of the Federal

Records Act.  Plaintiffs no longer suffer a continuing injury, however, if the Government has

successfully recovered those emails or established their fatal loss.  See Judicial Watch, 844 F.3d

at 956.   The Court therefore examines that recovery effort.

The State Department first attempted to recover Clinton's emails in November 2014.  The

agency sent a letter to Clinton's attorney requesting copies of emails from her personal email

account that constituted federal records, if those records were not otherwise preserved in the

Department's recordkeeping system.  See CAI Compl., Exh. 4 (Kennedy Letter to Cheryl Mills)

at 1-2.  In response, Clinton's representatives canvassed the PRN Server for any pertinent work

emails and ultimately provided State with approximately 55,000 pages of responsive documents

(apparently all from the clintonemail.com address) on December 5, 2014. Id., Exh. 4 (Mills

Letter to Kennedy); see also First Priestap Decl., Exh. A at 15-16.  The Court relied principally

on that voluntary production in issuing its initial decision.  See Judicial Watch, 156 F. Supp. 3d

at 76-77.

In 2015, the FBI entered the equation, as part of its investigation to determine whether

Clinton had unlawfully handled classified information.  With her cooperation, the FBI obtained

and forensically searched:

- The Pagliano Server and two external hard drives used to create back-ups of it.
  See First Priestap Decl., ¶ 8; Judicial Watch, 844 F.3d at 955;

- The PRN Server and an external device used for back-ups.  See First Priestap Decl., ¶¶ 9-10; Exh. A at 5-7;

- The commercial email account used to migrate data from the Pagliano Server to the PRN Server.  See First Priestap Decl., ¶ 9; Exh. A at 17;

- Two Blackberry devices associated with Secretary Clinton.  See First Priestap Decl., ¶ 12; Exh. A at 8-9; and

- Three iPads associated with Secretary Clinton.  See First Priestap Decl., ¶ 13; Exh. A at 9.

All told, the FBI recovered nearly 17,500 unique pages of emails above and beyond those already submitted by Clinton's team.  Id. at 19.

In light of those extensive efforts, the Court of Appeals noted that "[i]f appellants had only sought emails from the [Pagliano] server account, a mootness argument based on the recovery of the server might well succeed."  Judicial Watch, 844 F.3d at 955.  Perhaps taking the hint, Plaintiffs do not directly challenge the State Department's recovery effort related to the Pagliano Server.  This Court, too, sees no loose ends: since the initial opinion in this case, the FBI has issued a report summarizing its investigative efforts and turned over all relevant emails from that server to the State Department.  See First Priestap Decl., Exh. A; Supp. Priestap Decl., ¶ 12.  The Court, accordingly, finds Defendants have "recovered" all relevant communications from the Pagliano Server.  See Judicial Watch, 844 F.3d at 955-56.

Plaintiffs also forgo any direct challenge to the clintonemail.com account, instead zeroing in on the so-called "Blackberry emails," — i.e., those sent during Clinton's first months in office (from January 21, 2009, to March 18, 2009).  To recap, she used that email account sporadically after her swearing-in, as she had essentially transitioned to the clintonemail.com account by mid-January.  The Blackberry emails thus stand as "[t]he core dispute at this stage of litigation."  CAI Opp. at 3; see also id. at 7 ("As the Court of Appeals recognized, the primary trove of

unrecovered federal records at issue in this case is the BlackBerry e-mails from the first three

months of Secretary Clinton's tenure.") (citing <u>Judicial Watch</u>, 844 F.3d at 955-56).

Clinton initially failed to provide the State Department with emails from her Blackberry

accounts, as her team could not locate any such records from that period.  <u>See</u> First Priestap

Decl., Exh. A at 20 n.bbb.  As part of its forensic review, the FBI recovered "some" emails from

January 23, 2009, to March 18, 2009, from a device used to back up the PRN Server.  <u>Id.</u>  It

suspects, however, that those emails are "likely only a subset" of those sent.  <u>Id.</u>  On remand, the

Government does not contest that some Blackberry emails remain missing.  Because Defendants

apparently did not "recover[]" all relevant emails, the Court must consider whether they are

fatally lost or whether further digging may recover some missing messages.  <u>See</u> <u>Judicial Watch</u>,

944 F.3d at 956.

On cue, Lawrence Brewer, the Chief Records Officer for NARA, avers that the agency

does "not know or have reason to believe that recoverable Clinton email records remain extant."

Second Brewer Decl., ¶ 3.  NARA, typically the watchdog for federal records, believes that the

State Department's and FBI's "efforts to recover the missing Federal records . . . are consistent

with what agencies are required to do when records have been destroyed or alienated."  <u>Id.</u>  State

says the same.  <u>See</u> Second Stein Decl., ¶ 3 ("State [has] reached its determination that it does

not know or have reason to believe that recoverable Clinton email records remain extant that are

not currently in the federal government's possession.").  In other words, the agencies themselves

believe all emails are either recovered or fatally lost.

Plaintiffs, understandably, hesitate to take Defendants' word for it.  This Court, too, must

be wary of relying solely on the agencies' self-assessment.  Although the D.C. Circuit did not

define precisely how Defendants might "establish . . . fatal loss," it left little doubt that the hurdle

was high.  See Judicial Watch, 844 F.3d at 956.  The Federal Records Act provides that agencies

shall initiate action with the Attorney General when they "know[] or [have] reason to believe

[records] have been unlawfully removed from that agency."  44 U.S.C. § 3106.  In other words,

the statute directs agencies to take action so long as records were removed, leaving little room

for the agencies themselves to determine whether those records are "recoverable."  Rather, the

FRA treats "the law enforcement authority of the United States [as] a key weapon in assuring

record preservation and recovery," such that a suit would be moot only if there are no more

"imaginable" avenues for the Attorney General to pursue.  Judicial Watch, 844 F.3d at 956.

Ordinarily, then, referral to the Attorney General will be the remedy for unrecovered records.

        This, however, is no ordinary case.  The Government has already deployed the law-

enforcement authority of the United States to recover Clinton's emails, as the FBI has sought

those records as part of its investigation into whether Clinton mismanaged classified information.

The Court thus need not speculate about what the Attorney General might do.  On remand,

Defendants have submitted the declaration of Special Agent E.W. Priestap, the FBI's lead

investigator in the Clinton case.  Agent Priestap swore that "there were no further steps that

could have been reasonably undertaken by the FBI that would have recovered additional Clinton

work-related e-mails."  Supp. Priestap Decl., ¶ 12.  As Assistant Director in the

Counterintelligence Division, Priestap supervised the investigation into Clinton's private emails

and server.  Id., ¶¶ 1, 2.  His sworn affidavit recounts the FBI's extensive efforts to locate "all

potentially work-related" emails.  Id., ¶ 12.  During that investigation, the "period of January 21,

2009[,] to March 18, 2009" — i.e., the period in which Clinton used the Blackberry account —

was apparently "of particular interest to the FBI[]," as the agency hoped "to understand the

[Secretary's] rationale for establishing a private e-mail server" in the first instance.  Id., ¶ 6.

The Court's review of the supplemented record confirms that the FBI has exhausted all imaginable investigative avenues.  For starters, the Bureau utilized numerous investigative methods to obtain any missing emails, including 1) seeking consensual access to any email repositories, and 2) obtaining personal electronic devices used by the Secretary that might have contained relevant emails.  Id., ¶ 4.  In the course of its investigation, the FBI also interviewed individuals who had the most frequent work-related communications with Secretary Clinton, thereby obtaining additional email correspondence.  Id.

When those initial efforts came up short, the agency shook "the tree harder," Judicial Watch, 844 F.3d at 955, turning to legal process.  See Supp. Priestap Decl., ¶ 5.  Most infamously, the FBI discovered conceivably pertinent emails during an unrelated investigation into Anthony Weiner, the then-husband of Clinton's deputy chief of staff, Huma Abedin.  Id., ¶ 12; see also Matt Apuzzo, et al., Justice Department Obtains Warrant to Review Clinton Aide's Emails, N.Y. Times (Oct. 30, 2016).  In response, it sought search warrants of Abedin's computer to ensure there were no new work-related emails located there.  See id.; see also Supp. Priestap Decl., ¶ 12.  Since the Court of Appeals issued its decision, the Government has also revealed that it used grand-jury subpoenas to assess whether service providers might still maintain Clinton's emails.  See First Priestap Decl., ¶ 4.

In June 2017, Defendants submitted a second declaration sketching in the details of those grand-jury subpoenas.  See Judicial Watch, Inc. v. Tillerson, 2017 WL 3835677, at *1 (D.D.C. Aug. 31, 2017).  This later declaration came with a catch: the Government redacted the bulk of the public document, submitting the full version for in camera and ex parte review only.  Id.  Plaintiffs responded with a Motion to Produce, arguing that to the extent the Court might rely on the declaration, they must have unfiltered access.  Id.  The Court agreed the affidavit should be

14

public and therefore granted Plaintiffs' motion, subject only to a narrow exception.  Id.
Defendants thus resubmitted an amended and largely unredacted "Supplemental" Priestap
declaration.  See ECF No. 52 (Notice of Filing of Supp. Priestap Decl.).

Priestap's latest declaration reveals that the FBI subpoenaed RIM, the maker of
Blackberry electronic devices; Cingular Wireless and its successor, AT&T wireless, which
provided mobile-phone service and thus data access; and the unnamed third-party service
provider for Clinton's emails.  See Supp. Priestap Decl., ¶ 8.  All four service providers
confirmed that they "no longer retained . . . electronic communications transaction information
for the accounts" and, therefore, could not produce even the most basic information (such as the
subject lines or headers) requested by the FBI.  Id., ¶¶ 9, 10.  The Bureau deemed those
responses consistent with its understanding of Blackberry devices, which "pulled" information
off servers rather than storing it on a separate "cloud" server.  Id., ¶ 10.  Leaving nothing to
chance, however, the FBI reissued the subpoenas and contacted the service providers directly.
Id.  Once again, the providers confirmed that they stored "no data" related to the accounts,
meaning any content would be unavailable.  Id.

Having come up empty on those fronts, Priestap believes that the FBI has taken "all
reasonable and comprehensive efforts to recover email communications relevant to its
investigation" and sees no "further steps" to take.  Id., ¶ 12.  In other words, the Attorney
General's investigative arm joins Defendants' conclusion that there are no remaining emails for
State to recover.  The FBI so concluded as part of an investigation related to national security, in
which it had every incentive to "shake the tree" with all its might.  It strains credulity that the
Attorney General would implement a more exhaustive search in response to a federal-records
request.

Plaintiffs protest that the FBI hunted only for <u>classified</u> emails.  <u>See</u> CAI Reply at 13.

Not so.  Although its <u>investigation</u> focused on whether Clinton transmitted or stored classified

information on her private systems, its <u>search</u> for emails was not so limited.  Rather, "the FBI

sought to obtain <u>all</u> identified e-mail communications that were transmitted or stored upon

former Secretary Clinton's private e-mail servers."  Supp. Priestap Decl., ¶ 4 (emphasis added);

<u>see also id.</u>, ¶ 12 (saying FBI sought "<u>all</u> potentially <u>work-related</u> emails from the former

Secretary's tenure") (emphasis added).  Only once the Bureau had recovered the universe of

emails could it provide "relevant emails for classification review to the appropriate U.S.

Government agencies."  <u>Id.</u>, ¶ 12.  In other words, it conducted blanket searches for any

plausibly work-related emails because it could not have known *ex ante* whether those emails

would contain classified information.  Its search was thus coextensive with (and perhaps broader

than) that required by the Federal Records Act.

Cause of Action also moves to strike portions of Agent Priestap's declaration under

Federal Rule of Evidence 702, claiming that he offers an "expert" opinion that is neither relevant

nor reliable.  Rule 702 governs evidentiary proceedings and permits expert testimony that "will

help the trier of fact to understand the evidence."  Even assuming the Court is the trier of fact

here, however, Agent Priestap does not purport to be an "expert" on FBI searches.  Rather, he

has recounted the agency's efforts to recover Clinton's emails and, as a supervisor of that

investigation, opined on the sufficiency of those efforts.  Courts frequently rely on government

affidavits to adjudicate an agency's "retrieval efforts" in the FOIA context.  <u>See</u> <u>Perry v. Block</u>,

684 F.2d 121, 126 (D.C. Cir. 1982) (quoting <u>Founding Church of Scientology v. Nat'l Security</u>

<u>Agency</u>, 610 F.2d 824, 836 (D.C. Cir. 1979)).  Here, too, the Court faces the "peculiar[]"

situation in which the agency is "in sole possession" of the relevant information, as FBI

personnel have conducted the disputed searches.  Id.  The Court therefore necessarily relies on the agency's assessments of those searches, although the above analysis shows that it examines such assessments with care.

In any event, the Court finds Priestap's opinions to be relevant and reliable.  As outlined above, he "supervised the Clinton Server Investigation" and thereby witnessed firsthand the "investigative efforts" taken to secure her emails.  See Supp. Priestap Decl., ¶ 2.  He is thus uniquely situated to assess what further steps the FBI might plausibly pursue.  His opinion is also relevant.  Although the FBI and the Attorney General are not one and the same, Jeff Sessions would necessarily look to his investigative arm to recover Clinton's emails.  The FBI's own assessment of its searches is therefore telling.

### 3.   Plaintiffs' Proposed Recovery Tactics

Despite the Bureau's assurance that no reasonable steps remain to recover Clinton's emails, Plaintiffs suggest alternative measures that the Attorney General might take.  Although they do not always tie these investigative actions to specific missing emails, Plaintiffs presumably target emails from January 21, 2009, to March 18, 2009, as they cite no other possible gaps in the record.  The Court addresses each proffered tactic.

### a.   Forensic Searches of Third-Party Servers

As explained above, Agent Priestap submitted a declaration as to the FBI's efforts to recover the Blackberry emails through grand-jury subpoenas.  Plaintiffs initially rejected the affidavit as insufficient because it failed to identify the targets and scope of the subpoenas.  See CAI Opp. at 8 (asking questions such as "Who or what were the targets of the subpoenas? What did the subpoenas demand? How many subpoenas were there? . . . What were [the] responses?").

Pursuant to an Order from this Court, see ECF No. 49, Defendants have filed an amended

declaration making public many of those missing pieces.

Plaintiffs nevertheless deem the subpoenas deficient because the FBI did not search those

third-party providers' servers by forensic means.  See CAI Reply at 14-15.  The Government

retorts that while searching Clinton's servers for her emails was a fruitful task, that process alone

took months.  See Gov't Reply at 7.  Asking AT&T or Blackberry to search their servers, which

house millions of communications from millions of users, is more akin to searching "for specific

grains of sand on a beach."  Id.  The FBI declined to take that route, as it had (and still has) no

basis to believe it would find relevant emails through such a search; indeed, the service providers

swore in response to subpoenas that they retained "no data" related to the emails.  See Supp.

Priestap Decl., ¶ 10.  More to the point, the Government apparently sees no legal basis to order

those third parties to forensically search their servers.  See Gov't Reply at 6-7 (noting plaintiffs

offered no authority that would require the service providers to conduct search or allow

Government to do so).  If the FBI believes its investigation has provided no factual basis to

search those servers, the Court deems it unimaginable that the Attorney General would

nevertheless chart that course.

### b.     iMac Computer

Cause of Action next suggests that Clinton's current iMac computer might be "another

repository [for] unlawfully removed federal records."  CAI Opp. at 9-10.  To refresh, Bill

Clinton set up the private Apple Server for his staffers, before the Clintons adopted the Pagliano

Server in March 2009.  See First Priestap Decl., Exh. A at 4.  There is confusion in the record

about whether Hillary Clinton linked any of her personal email accounts to the Apple Server.  It

appears she used third-party servers to host her Blackberry account during that period, but one

staffer suggested that the Apple Server briefly hosted the Secretary's clintonemail.com account.
Id.  There is no suggestion, however, that any emails from the latter account are actually missing,
and Plaintiffs do not argue as much.  Indeed, Clinton's staff members believe that they migrated
all emails from the Apple Server to the Pagliano Server in the transition.  Id. at 4.  If so, there is
no meaningful data left on the former.

      In any event, the Apple Server is long gone.  After the server transition, Clinton
repurposed the server for use as a personal computer by household staff.  Id.  In 2014 — more
than five years later — she bought a new iMac Computer and apparently transferred some data
from the Apple Server onto that device before jettisoning the original server.  Id. at 4-5.  It is that
latest computer that is at issue in this case, and it is only relevant if a) there were any Clinton
emails on the Apple Server that b) were omitted in the first migration to the Pagliano Server, but
nevertheless c) were inadvertently migrated five years later to a new iMac computer.

      The Government considers those dots too remote to connect.  The FBI concluded that
"there was no investigative reason to believe that any email from the original Apple Server"
would be on the newer iMac computer.  See Gov't Reply at 11; see also First Priestap Decl., ¶ 7.
Given the lack of probable cause, the Government "had no legal basis to attempt to obtain the
iMac hard drive."  Gov't Reply at 12.  In an abundance of caution, however, the FBI took the
only step legally available to it: it asked Clinton's lawyers, Williams & Connolly, to voluntarily
review the iMac computer for any relevant records by using "a keyword search consisting of
terms identified by the FBI."   First Priestap Decl., ¶ 7.  After doing so, Williams & Connolly

confirmed that the computer contained no emails from Clinton's time at State, and the Bureau found no information that cast doubt on that conclusion.  Id.

CAI spills much ink attacking the firm's conclusions as hearsay and questioning the reliability of its report.  See CAI Opp. at 9-17.  Its charges, however, miss the mark.  Even were hearsay inadmissible in this context, the Court's conclusion does not hinge on whether Williams & Connolly was correct that the iMac housed no Clinton emails (although this Court has no reason to doubt the firm's veracity).  Rather, the important point is that Williams & Connolly told the FBI as much, and the Bureau believes it has no further routes to pursue.  Having apparently concluded there was no legal basis for a warrant to search the iMac computer, the FBI needed to rely on this type of voluntary report.  Once again, the Court deems it exceedingly farfetched that the Attorney General would pursue a different course for missing federal records.

### c.      Mobile Devices/iPads

In one paragraph, Cause of Action cursorily contends that the FBI should have subpoenaed Clinton's thirteen mobile devices and five iPads.  See CAI Opp. at 16 & n.7.  This, too, is not a plausible investigative action.  First, the Bureau did request the relevant devices from Clinton's team and thereby recovered two phones and three iPads.  See First Priestap Decl., ¶¶ 11-13.  None of the phones contained relevant records.  Id., ¶ 12.  Two of the iPads were likewise barren, and the remaining iPad contained three emails from 2012 in a "drafts" folder.  Id., ¶ 13.  The FBI thus had little reason to believe that the other devices would contain emails at all, much less unrecovered emails.  That is especially so because, in her interview with FBI agents, Clinton said that she required her aides to dispose of Blackberry SIM cards as soon as she switched to a new device.  Id., Exh. A at 9.  One aide testified to physically destroying at least two Blackberries with a hammer.  Id.  Short of resurrecting those phones from the dead, the FBI

had no way to examine any such device.  The iPads would also lead to dead ends for the

Plaintiffs — Apple did not even release the first iPad for public use until April 2010, well after

Clinton had switched to the Pagliano Server.  Once again, with no reason to believe that the

phones or iPads would house relevant emails (or even remain intact), the Attorney General

would have no basis to subpoena them.

d.      Third Parties

Finally, Judicial Watch suggests a different course: interviewing third parties.  <u>See</u> JW

Opp. at 4-6.  It alleges that neither "Defendants nor the FBI sought records from persons who

received or sent emails to Secretary Clinton and other officials."  <u>Id.</u> at 4.  On the contrary, the

FBI did interview individuals who most frequently exchanged work-related communications

with Secretary Clinton, including Cheryl Mills, Clinton's Chief of Staff; Jake Sullivan, the

Director of Policy Planning; Huma Abedin, the Deputy Chief of Staff; and Sidney Blumenthal,

an informal political advisor.  <u>See</u> First. Priestap Decl., Exh. A at 24-26.  Those interviews are

significant, as the FBI determined that only thirteen individuals regularly maintained direct email

contact with Clinton through her clintonemail.com account.  <u>See id.</u>, Exh. A at 13.  Indeed, Mills,

Sullivan, and Abedin accounted for 68% "of the emails sent directly to Clinton."  <u>Id.</u>  Pursuant to

those interviews, the Bureau obtained additional email correspondence between those individuals

and Clinton, most of which were copies already collected.  <u>See</u> Supp. Priestap Decl., ¶ 4.

Additionally, as Judicial Watch concedes, any email sent to or from a State employee is already

in the Department's possession.  <u>See</u> JW Opp. at 4.

Plaintiff would have the FBI go deeper into the well.  Most concretely, it seeks email

correspondence between Clinton and David Petraeus, who then headed U.S. Central Command

(CENTCOM).  <u>Id.</u> at 6.  Judicial Watch relies on one FBI agent's handwritten notes from an

21

interview with a State Department employee, which suggest that Clinton and Petraeus exchanged "1000 emails," "most not in the 30k." JW Opp., Exh. C (FBI Notes) at HRC-2573. Assuming "not in the 30k" means "unrecovered," that report might suggest a hole in Defendants' effort. But in a sworn affidavit, the Government explains that the "1000" emails listed in the report is a red herring. See Second Stein Decl., ¶¶ 5-6. In July 2015, CENTCOM queried its system using the keywords "Hillary" or "Clinton" and estimated that approximately 2,200 emails matched the search. Id., ¶ 6. That search, however, did not reflect the numbers of emails actually sent or received by Clinton; rather, it captured any threads referencing the Secretary. Id. In August 2015, the agency conducted a more targeted search and found 18 email threads between Clinton and Petraeus. Id. Each was a copy of threads already produced to the State Department. Id. To be safe, the Department of Defense nonetheless sent those 18 email threads to State, id., and thereby closed the chapter on the Petraeus emails.

Judicial Watch adds a string cite of other potential interviewees. See JW Opp. at 5. To compile the list, it reviewed the State Department's published database of Clinton's emails and identified her frequent correspondents, which it deems "likely" to have missing records. Id.; see also id., Exh. A (Declaration of Kristi Jesperson). That logic, however, suffers a fatal flaw: Plaintiff compiled its list from emails already recovered. See JW Opp. at 5. Contra Judicial Watch, it is not obvious — or even likely — that persons on the "frequent sender" list would have exchanged unrecovered emails.

A review of the same public database consulted by Plaintiff reveals that Clinton emailed the following people between January 2009 and March 18, 2009:

- Huma Abedin

- Doug Band, the chief of staff of the Clinton Foundation

- Colin Powell, a former Secretary of State

- Lona Valmoro, a special assistant

- Oscar Flores, a personal aide

- Lissa Muscatine, a Clinton speechwriter.

U.S. Dep't of State, Virtual Reading Room Documents (last accessed Nov. 1, 2017), <u>available at</u>

https://foia.state.gov/search/results.aspx?searchText=*&caseNumber=F-2016-07895.  All but

Colin Powell used Clinton's newer clintonemail.com domain, and there is no allegation of any

missing records from that account nor reason to think that these contacts sent other, unrecovered

messages.  Apparently, Clinton's most frequent contacts knew she had transitioned from the

Blackberry account by her swearing-in.  From time to time, Clinton would receive emails on her

Blackberry account and forward them to her assistant, Oscar Flores, with instructions to print.

From reviewing those records, the Court sees no pattern to those contacts and, again, has no

reason to suspect that they might harbor additional emails.

 Against that backdrop, the Archivist, State Department, FBI, and, indeed, the Attorney

General would have little reason to suspect that any of Judicial Watch's "frequent senders" — or

any other known email recipients — have copies of any <u>unrecovered</u> records.  While it is

plausible, albeit barely, that some third parties <u>might</u> retain relevant records nearly a decade after

the conversations, and that the FBI <u>might</u> convince such parties to turn them over voluntarily, the

Attorney General has no way to know who those third parties might be.  The FBI understandably

deemed this path too far afield to pursue, and the Court once again concludes that it is

implausible that the Attorney General would buck its own investigative arm to demand

otherwise.  The Court of Appeals may have asked the Government to "shak[e] the tree harder"

for more emails, but it never suggested that the FBI must shake every tree in every forest, without knowing whether they are fruit trees.  See Judicial Watch, 844 F.3d at 955.

* * *

To sum up, Defendants and the FBI have recited chapter and verse of their efforts to recover Secretary Clinton's emails.  Those efforts went well beyond the mine-run search for missing federal records, see Second Brewer Decl., ¶¶ 11-14, and were largely successful, save for some emails sent during a two-month stretch.  Even then, the FBI pursued every imaginable avenue to recover the missing emails.  Plaintiffs, significantly, cast no real doubt on that conclusion.  So now, when the Government avers that there are no enforcement steps left for the Attorney General, the Court takes such conclusion seriously.  It thus finds that Defendants have "secur[ed] custody of all emails that the Attorney General could have recovered in an enforcement action," Judicial Watch, 844 F.3d at 955, such that the suit is moot.

C.  Jurisdictional Discovery

In addition to opposing Defendants' Motion to Dismiss, CAI has separately moved for jurisdictional discovery.  See ECF No. 38.  In this circuit, "if a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." GTE New Media Servs. Inc. v. BellSouth Corp., 199 F.3d 1343, 1351 (D.C. Cir. 2000).  At the same time, "[i]t is well established that the district court has broad discretion in its resolution of [jurisdictional] discovery problems."  FC Inv. Grp. LC v. IFX Mkts., Ltd., 529 F.3d 1087, 1093 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

Courts typically permit jurisdictional discovery where "[t]he record . . . before the court is plainly inadequate," and the party seeking discovery "may be able to present new facts to bolster [its] theory" regarding jurisdiction.  BellSouth Corp., 199 F.3d at 1352.  "[H]owever, in

order to get jurisdictional discovery a plaintiff must have at least a good faith belief that such

discovery will enable it to show that the court" enjoys jurisdiction over the suit.  Caribbean

Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1090 (D.C. Cir. 1998).  Furthermore,

"a plaintiff must make a 'detailed showing of what discovery it wishes to conduct or what results

it thinks such discovery would produce.'"  NBC-USA Housing, Inc., Twenty-Six v. Donovan,

774 F. Supp. 2d 277, 295 (D.D.C. 2011) (quoting Atlantigas Corp. v. Nisource, Inc., 290 F.

Supp. 2d 34, 53 (D.D.C. 2003)).  Importantly, "a request for jurisdictional discovery cannot be

based on mere conjecture or speculation."  IFX Mkts., Ltd., 529 F.3d at 1094 (citing Bastin v.

Fed. Nat'l Mortgage Ass'n, 104 F.3d 1392, 1396 (D.C. Cir. 1997)).

    In this case, Cause of Action seeks discovery "to determine the extent of the federal

government's purported efforts to recover the BlackBerry e-mails and adequately search the

iMac computer."  CAI Opp. at 23.  The Court sees no need for discovery on either score.  First,

as discussed above, Defendants have extensively documented their (and the FBI's) efforts to

track down the Blackberry account.  When CAI moved for discovery, it complained that

Defendants had relied on bare allegations that the FBI had used grand-jury subpoenas, without

"identifying the targets, the subpoenas' scope, and the substance of the targets' response."  Id. at

23-24.  Defendants have since supplemented the record with a second declaration, which

provides exactly that information.  The Government has now documented extensively the

subpoenas related to this suit, while staying within the bounds of Federal Rule of Criminal

Procedure 6(e), which favors keeping those matters secret.  The Court therefore finds nothing left

for Plaintiffs to discover.

    So, too, for the iMac computer.  Plaintiff complains that Defendants "rely on

inadmissible hearsay in an attempt to establish that the iMac contains no recoverable federal

records." CAI Opp. at 24.  In other words, it finds the iMac report unpersuasive to establish

mootness, an argument that this Court rejected above.  It is unclear, however, how that complaint

relates to jurisdictional discovery.  Cause of Action also suggests that it cannot "ascertain the

complete facts about Defendants[']" efforts related to the iMac computer.  Id.  As an initial

matter, Plaintiff's questions relate largely to the FBI, not the State Department, from whom it

seeks discovery.  It offers no reason, moreover, to suspect that the FBI has withheld information

in that regard.  Plaintiffs may see Williams & Connolly's report as vague, but the Bureau did not

personally conduct the iMac search, so it, too, had to rely on Clinton's lawyers.   Indeed, it is

unclear why the FBI would harbor hidden reports related to the iMac.  If the Government had

information as to additional search efforts, turning those over to the Court would only have

bolstered its case for mootness.  Plaintiff has thus failed to persuade the Court that it has "a good

faith basis" to believe facts supporting jurisdiction exist and are likely to be found with targeted

discovery.  See NBC-USA Housing, 774 F. Supp. 2d at 295.  As such, the Court will deny its

Motion.

## IV.    Conclusion

For the foregoing reasons, the Court will deny Cause of Action's Motions for

Jurisdictional Discovery and to Strike, and it will grant Defendants' Motion to Dismiss.  A

contemporaneous Order to that effect will issue this day.


/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge


Date: November 9, 2017